**STATE of Minnesota, Respondent,**

**v.**

**John Ray CAPERS, Appellant.**

**No. C7-89-704.**

Court of Appeals of Minnesota.

Feb. 20, 1990.

Review Denied April 25, 1990.

Hubert H. Humphrey, III, State Atty. Gen., Tom Foley, Ramsey County Atty., Darrell C. Hill, Asst. County Atty., St. Paul, for respondent.

John M. Stuart, State Public Defender, Susan L.-P. Hauge, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by NORTON, P.J., and HUSPENI and STONE,* JJ.

## OPINION

HUSPENI, Judge.

Appellant was charged with first degree burglary in one incident and with financial transaction card fraud in another. The fraud charge was submitted to the court on the record; the burglary charge was tried to a jury. Appellant, then on probation following a conviction on another charge, was convicted on both charges and sentenced; his probation was revoked. Appellant alleges that the evidence was insufficient to identify him as the perpetrator of the burglary and that he was illegally stopped after the fraudulent transaction, in violation of his fourth amendment rights. We affirm.

## FACTS

1. The Burglary

The amended complaint alleges that appellant

> did wrongfully, unlawfully, enter a building * * * without consent of the lawful possessor, * * * with intent to commit a crime, to-wit: Theft, and the building was a dwelling and another person not an accomplice of [appellant] was present in the building.

Charlene Carter left her house at about 2 p.m. on October 22, 1988. Before driving off, she waited in the car for five to ten

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

minutes because she noticed a strange man wandering around. Her daughter Sharon, 16, who was home alone heard noises and went downstairs to investigate. Sharon observed a man leaving the kitchen by the back door, from which a window panel had been unscrewed and pried out. She telephoned the police and went upstairs to change clothes. From the upstairs windows, she observed a man in the vicinity of the house for about 10 minutes, and was certain that this was the same man she had seen leaving the house. A few days later, both mother and daughter independently identified appellant's photo in a group of 11 photos at the police station as the man they had seen on October 22; they also identified his clothes.

Appellant agreed that he was in the vicinity of the house that afternoon, wearing those clothes, and said he did not notice anyone similar to himself in dress or appearance. Witnesses were unable to support with certainty appellant's alleged reasons for being in the neighborhood that day.

## 2. The Fraud

On November 4, an off-duty police officer from the fraud and forgery unit observed appellant shopping in a clothing store. Appellant attracted the officer's attention because he looked atypical for a customer of that store. Appellant purchased three expensive sweaters very rapidly, using a credit card. The officer was aware that a common fraud scheme was to purchase items with a stolen credit card and later return the items for cash. After learning that the clerk had not checked appellant's identification, the officer pursued appellant out of the store, identified himself as a police officer, and asked to see appellant's identification. The identification, a Hennepin County Human Services card, bore appellant's picture but a name different from that on the credit card. Appellant denied using a credit card, whereupon the officer asked him to return to the store. Upon arriving at the store, the officer asked the clerk to call the police. Appellant then began to struggle; he placed his hand on a square black object in his waistband which the officer testified appeared to be the butt of a pistol, and said, "Back off or I'll blow you away." He then left the store and was later found outside hiding in a dumpster. The credit card in the questioned transaction did not belong to appellant, and the owner had not given appellant permission to use it.

## ISSUES

1. Was the evidence sufficient to support appellant's conviction for burglary?

2. Did the officer who stopped appellant following the fraudulent credit card transaction have a specific and articulable basis for doing so?

## ANALYSIS

1. The only issue appellant raised concerning his burglary conviction was whether there was adequate evidence to establish him as the perpetrator.

■ The standard of review for the sufficiency of the evidence to support a jury conviction based on eyewitness testimony is set forth in *State v. Daniels*, 361 N.W.2d 819 (Minn.1985).

> "If the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the offense charged, the court will not disturb its verdict." The court will examine the evidence by viewing it in the light most favorable to the verdict and will assume that the jury disbelieved any testimony in conflict with the result it reached.

> The jury is to determine the weight and credibility of the testimony of individual witnesses. * * * An identification need not be positive and certain to support a conviction; it can be sufficient if a witness testified that in his belief, opinion, and judgment the defendant is the one he saw commit the crime.

*Id.* at 826–27 (quoting *State v. Ellingson*, 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969)) (other citations omitted). Appellant

admits he was the person both Ms. Carter and Sharon saw outside the house; however, he denies having been the person Sharon saw in the house.

The five factors to be considered in assessing identification by an eyewitness appear in *State v. Burch*, 284 Minn. 300, 315–16, 170 N.W.2d 543, 553–54 (1969):

> ■ the opportunity of the witness to see the defendant at the time the crime was committed, [2] the length of time the person committing the crime was in the witness' view, [3] the stress the witness was under at the time, [4] the lapse of time between the crime and the identification, and [5] the effect of the procedures followed by the police as either testing the identification or simply reinforcing the witness' initial determination that the defendant is the one who committed the crime.

Regarding the first factor, it was daylight and Sharon had a clear view. Factors two and three are influenced by the fact that someone observing a fleeing burglar inevitably has very limited time and is under stress. This court concluded in *State v. Roehl*, 409 N.W.2d 44 (1987), that when the eyewitness report included numerous details, neither brevity of observation nor stress precluded the accuracy of eyewitness identification. Sharon's observation of appellant in the house included details about appellant's gloves, jacket, stature, facial features, and hair. Sharon identified appellant a few minutes later as she observed him outside the house while she was speaking to the police, and identified his photo from a lineup four days later, which was a reasonably brief time. *See State v. Myers*, 413 N.W.2d 122 (Minn.Ct. App.1987), *aff'd as modified* 416 N.W.2d 736 (Minn.1987). Finally, the police were meticulous in showing the 11 photos to Sharon and to Ms. Carter separately, and in random order, before appellant had been identified as a suspect, thus satisfying the fifth *Burch* factor.

The jury believed Sharon's testimony that appellant was not only the man she observed outside her house, but that he was the man she had observed inside the house moments earlier; it disbelieved appellant's testimony that he had been outside but not inside the house. Appellant's prior convictions for uttering a forged instrument and for receiving stolen property, as well as the disparity between his and Sharon's interests in the outcome of the case, were factors relative to his credibility. Since the jury could reasonably have believed that appellant was the perpetrator of the burglary, his conviction should be upheld.

■ In his *pro se* brief, appellant argues that the identifications of his jacket and slacks were erroneous because Sharon and Ms. Carter were shown not a collection of jackets and slacks, but only his, and that this testimony should have been suppressed. However, no objection had been made to the testimony earlier, and this issue was not preserved for appeal. *See* Minn.R.Evid. 103(a)(1). Further, case law is inconsistent with the notion that a lineup of clothing is necessary for a fair identification. *See State v. Burgess*, 290 Minn. 480, 481, 185 N.W.2d 537, 538–39 (1971).

2. The supreme court discussed the appropriate level of review for the constitutionality of a stop in *Wold v. State*, 430 N.W.2d 171, 173–74 (1988). Under the rationale of *Wold*, this court cannot overturn the trial court's finding as to the stop of appellant unless that finding is "clearly erroneous."

■ The Minnesota standard for determining whether a stipulated set of facts reaches the "reasonable and articulable" level mandated by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) for a legal stop was set forth in *State v. DeSart*, 357 N.W.2d 416 (Minn.Ct.App.1984).

> Minnesota has adopted the "totality of the circumstances" test in determining "whether the police who made the stop are able to articulate at the omnibus hearing that they had a 'particularized and objective basis for suspecting the particular persons stopped of criminal activity.' "
>
> All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity.

The Minnesota Supreme Court upheld [a] stop, stating, "Here, *the facts, together with the reasonable inferences an experienced police officer could draw therefrom,* justify the minimal intrusion upon defendant's rights."

*Id.* at 418 (citations omitted) (emphasis added). While a layman unfamiliar with credit card fraud might have been merely curious about appellant's conduct, and thus unjustified in pursuing and stopping appellant, a police officer experienced in credit card fraud could reasonably have seen that same conduct as suspicious, and, coupled with the fact that the clerk had sought no other identification when the card was presented, used that conduct as a justification for a stop. The relevance of a police officer's experience as a valid factor in assessing suspicious conduct reflects the language of *Terry,* which approved a stop if an officer

observes unusual conduct which leads him reasonably to conclude *in light of his experience* that criminal activity may be afoot * * *.

*Terry,* 392 U.S. at 30, 88 S.Ct. at 1884 (emphasis added).

The *Terry* holding permitted a stop as part of an officer's effort to prevent crime, but there is a rationale for extending its principle to the detection of crime.

"law enforcement officer[s] will be confronted with many situations in which it seems necessary to acquire some further information from or about a person whose name he does not know, and whom, if further action is not taken, he is unlikely to find again. * * *

[I]n such circumstances, where a crime may have been committed and a suspect or important witness is about to disappear, it seems irrational to deprive the officer of the opportunity to 'freeze' the situation for a short time, so that he may make inquiry and arrive at a considered judgment about further action to be taken * * *."

The lower courts have accepted this view without hesitation, as *Terry* has often been applied in upholding the stop of a suspect found near the scene of a recent crime.

3 LaFave, *Search and Seizure,* 2nd edition, 351–52 (quoting Model Code of Pre–Arraignment Procedure, 270–272 (1975)) (emphasis added) (footnote omitted).

The parties differ in their opinions as to when the stop of appellant occurred. The state maintains that approaching appellant in a public place and asking him for his identification was not a stop, since appellant was free to leave, no other officers were present, no weapons were presented, and no threatening tone was used. An analogous situation, with reasoning supporting the state's contention, is presented in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980):

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official.

*Id.,* 446 U.S. at 554–55, 100 S.Ct. at 1877 (citations and footnote omitted). The state contends that the stop did not occur until the officer touched appellant to escort him back to the store; this was subsequent to appellant's producing identification with a

name different from that on the credit card, and asserting that he had not used a credit card. These two "specific and articulable facts" then formed part of the basis of the stop.

Appellant argues that the stop occurred when he was first asked for his identification, that it was therefore based only on his conduct in the store, and that since his conduct was open to other interpretations, the stop was illegal. However, even assuming that the stop did occur when the officer first spoke to appellant, the trial court's finding of legality can be sustained. The pertinent standard for a stop is not the same as that for an arrest.

> [I]n order to arrest it must appear more probable than not that criminal conduct has occurred. * * *
>
> By contrast, * * * the more-probable-than-not standard is never applicable to a brief stopping for investigation. * * *
> As stated in *United States v. Holland,* [510 F.2d 453 (9th Cir.1975)]: "Clearly, the officers were not required to rule out all possibility of innocent behavior before initiating a brief stop and request for identification."

3 LaFave, *Search and Seizure,* 2nd edition, 431–32 (footnotes omitted). The officer here was able to be quite specific in articulating the facts of appellant's appearance and conduct in the store which led to the officer's suspicion; the officer was not required to consider every possible interpretation of those facts before stopping appellant.

Appellant further argues that since evidence of his use and possession of the stolen credit card appeared only after he was stopped, this evidence should be suppressed as "the fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In view of our determination that the stop of appellant was legal, there is no *Wong Sun* issue.

In his pro se supplemental brief, appellant claims that the stolen credit card was inadmissible because it resulted from an illegal search and seizure of his wallet. Although this issue was not raised before the trial court, and therefore not properly before this court for review, our examination of the record convinces us that there is no merit to appellant's contentions.

### DECISION

The jury's conviction of appellant for burglary was adequately supported by the testimony of eyewitnesses, and the trial court's finding as to the officer's stop of appellant following the fraudulent credit card transaction was not clearly erroneous.

Affirmed.