STATE of Minnesota, Respondent,

v.

**Oluseyi HARRIS, Appellant.**

No. C1–97–2.

Court of Appeals of Minnesota.

Dec. 16, 1997.

Review Granted Feb. 19, 1998.

Hubert H. Humphrey III, Attorney General, St. Paul, for Respondent.

Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant County Attorney, St. Paul, for Respondent.

Steven P. Russett, Assistant State Public Defender, St. Paul, for Appellant.

Considered and decided by NORTON, P.J., and SCHUMACHER and THOMAS G. FORSBERG,* JJ.

## OPINION

NORTON, Judge.

In challenging his conviction of a controlled substance crime in the fifth degree following an encounter with police on a Greyhound bus, appellant argues the district court erred in refusing to suppress the evidence. The district court erred in determining that no seizure occurred, but correctly found the officers had reasonable articulable suspicion to suspect appellant of criminal activity. Furthermore, the record supports the district court's findings that appellant consented to the search of his person and his belongings. We affirm.

## FACTS

On May 23, 1996, St. Paul Police Officers Bratsch and Pyka were working undercover as part of a drug interdiction team at the Greyhound Bus Depot in St. Paul. Officer Bratsch received information from a concerned citizen that drugs were being smuggled into St. Paul via the bus station from Chicago and other cities. The plain-clothed officers were at the bus depot to intercept people bringing drugs into the Twin Cities.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 2.

While at the bus station, the officers observed appellant Oluseyi Harris and Tremell Caldwell get off a bus arriving from Chicago. Pyka informed Bratsch that appellant and his companion were conducting some type of "counter-surveillance." Bratsch observed the two men looking around the bus depot to see who was inside. They did not use the phone upon entering the bus depot; after a short time, they boarded the bus. Based on his experience as a narcotics officer, Bratsch recognized this type of behavior as being consistent with narcotics trafficking.

The officers followed appellant and Caldwell onto the bus in order to talk to them. The officers stood in the middle of the aisle and identified themselves as St. Paul narcotics officers. Next, as is his usual practice, Bratsch informed the passengers on the bus that the officers were looking for narcotics, weapons, or large amounts of currency. Bratsch then approached appellant, who was seated in the last seat on the bus. Bratsch identified himself to appellant by showing his badge and, after restating his purpose, informed appellant that this was all "consensual." Bratsch then asked appellant if he was carrying any weapons, narcotics, or large amounts of currency. After appellant said, "No," Bratsch asked if he could search appellant. Appellant told the officer, "Yes, go ahead." Bratsch conducted a thorough pat-down search, but did not find anything.

Next, Bratsch asked appellant if he had any bags. Appellant said he had a blue bag in the overhead compartment. Bratsch asked for and received appellant's permission to search the bag. Inside the bag were two baggies containing 40–75 plastic bindles. Based on his training and experience, Bratsch believed appellant was carrying the bindles in order to package drugs. Bratsch told appellant he knew the bindles were used for packaging drugs. The officer also told appellant that, if he had drugs, he should give them up.

At this point, appellant became very nervous and tried to hide his left arm. Bratsch asked appellant if he could see his arm. When appellant put his arm in his lap, the officer noticed a bulge in the sleeve of appellant's jacket. Bratsch asked if he could check the arm of the jacket. Appellant said, "Yes." When appellant stretched out his arm, the officer reached into the sleeve and pulled out a large bag of marijuana. The officer arrested appellant on drug possession charges.

The district court denied appellant's motion to suppress the evidence, finding the officers' conduct did not constitute a seizure, the officers had particularized suspicion, and appellant consented to the search of his belongings. Based on this evidence, the district court found appellant guilty as charged after appellant waived his right to a jury trial and submitted his case on stipulated facts.

## ISSUES

Did the district court err as a matter of law when it denied appellant's motion to suppress the evidence of the marijuana found in the sleeve of his jacket? Did the district court err as a matter of law in finding that appellant voluntarily consented to the search of his person and his belongings?

## ANALYSIS

When reviewing pretrial orders suppressing evidence, this court may independently review the facts and determine, as a matter of law, whether the trial court erred in suppressing the evidence. *State v. Othoudt,* 482 N.W.2d 218, 221 (Minn.1992). Specifically, when the facts are not in dispute, the reviewing court must determine whether the officer's actions constitute a seizure and if the officer articulated an adequate basis for the seizure. *State v. Day,* 461 N.W.2d 404, 406 (Minn.App.1990), *review denied* (Minn. Dec. 20, 1990).

### I.  Stop and Search

The Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution protect the right of the people to be free from unreasonable searches and seizures. As a general rule, officers may not search or seize an individual without an arrest warrant, search warrant, or probable cause. *Wold v. State,* 430 N.W.2d 171, 174 (Minn.1988). The federal courts have, however, made exceptions to

this rule. One exception to this general rule allows officers, under certain circumstances, to stop or seize an individual "for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Id.* (quoting *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)).

The first issue in this case is determining whether a seizure occurred when the two officers approached appellant in the back of the bus. This court holds the bus setting, combined with the conduct of the police, compels a determination that appellant was seized.

Recently, the United States Supreme Court rejected a "per se" rule that all encounters on a bus constitute a seizure. *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991). The Court abandoned the free-to-leave analysis, reasoning:

> When police attempt to question a person who is walking down the street or through an airport lobby, it makes sense to inquire whether a reasonable person would feel free to continue walking. But when the person is seated on a bus and has no desire to leave, the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter.

*Id.* at 435–36, 111 S.Ct. at 2387. In this type of situation, the appropriate analysis is whether a reasonable person in that position would feel free to "decline the officer's requests or otherwise terminate the encounter." *Id.*

Notwithstanding its holding, the Court refrained from determining whether a seizure occurred, stating:

> The trial court made no express findings of fact, and the Florida Supreme Court rested its decision on a single fact—that the encounter took place on a bus—rather than on the totality of the circumstances.

*Id.* at 437, 111 S.Ct. at 2388. The location of the encounter is an important factor, but it is not the only factor. *Id.,* at 437, 111 S.Ct. at 2387. As such, the Supreme Court remanded the matter to the Florida courts to deter-

mine whether a seizure occurred based on the totality of the circumstances. *Id.,* at 437, 111 S.Ct. at 2388.

■ Determining whether a seizure takes place on a bus is a matter of first impression for this court. Like the Supreme Court, this court is not willing to promulgate a general rule that a seizure automatically occurs, for purposes of the Sixth Amendment and Article I, Section 10 of the Minnesota Constitution, every time police officers board a bus. That is not to say, however, that appellant's presence on the bus is irrelevant. It is an important factor, albeit not the only factor, in determining whether appellant was seized. *Bostick,* 501 U.S. at 437, 111 S.Ct. at 2387. As *Bostick* indicates, our inquiry now turns to whether appellant was seized for purposes of the Fourth Amendment and Article I, Section 10 of the Minnesota Constitution, based on the totality of the circumstances.

■ The Minnesota standard for determining whether an investigatory seizure has occurred is essentially the same standard articulated in *Bostick.* In evaluating whether a seizure occurred, Minnesota courts determine whether a reasonable person in defendant's position, based on the totality of the circumstances, would have believed that "he or she was neither free to disregard the police questions nor free to terminate the encounter." *State v. Cripps,* 533 N.W.2d 388, 391 (Minn.1995); *Bostick,* 501 U.S. at 436, 111 S.Ct. at 2387 (holding appropriate analysis is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter"). Nevertheless, simply because an officer approaches a person in public and begins to ask questions does not mean that person should reasonably believe he or she is not free to leave. *Cripps,* 533 N.W.2d at 391. The reasonable person standard is an objective test based on the totality of the circumstances. *Id.*

For example, in *Cripps,* the defendant was seized when the officer asked her to show identification in order to prove that she was of legal drinking age. *Id.* The defendant was in a bar when a uniformed officer approached her. *Id.* The officer was carrying a weapon and openly displayed a badge. *Id.* The court

held this encounter was more than a simple inquiry because Cripps was asked to prove her innocence by showing identification. *Id.* Therefore, Cripps was in a position where she felt she was neither free to terminate the encounter nor free to disregard the officer's questions. *Id.*

■ Applying Fourth Amendment established principle, the facts indicate that appellant was seized. In this case, appellant was approached by not one, but two, armed officers. Although the officers were not in uniform, they did display their badges. In addition, the officers boarded the bus because they had their suspicions about appellant. In fact, the officers singled out appellant the moment he stepped off the bus. *Cf. Cripps,* 533 N.W.2d at 389–90 (finding officers lacked reasonable articulable suspicion when, admittedly without suspicion, entered a bar and randomly checked patrons' identification). Finally, the two police officers blocked the aisle and questioned appellant in the close quarters of the back of the bus. Based on the totality of the circumstances, appellant was in a position in which a reasonable person would not have felt free to disregard the officers' questions or terminate the encounter.

The facts in this case are even more indicative of a seizure than the situation presented in *Cripps.* As a result, we hold that appellant was seized for purposes of the Fourth Amendment and Article I, Section 10 of the Minnesota Constitution when the officers confronted him on the bus.

Having concluded that appellant was seized, we turn to whether the officers articulated sufficient facts justifying a seizure. Appellant offers any number of innocent explanations for his conduct, while the state argues that the officers' suspicions, coupled with appellant's actions, were enough to justify a seizure. We agree with the district court that Officer Bratsch had articulable suspicion to seize appellant.

■ For an investigatory stop or seizure to be lawful, the police officer must be able to point to specific, articulable facts that would lead to a reasonable suspicion that an individual is or may be engaged in criminal activity.

*Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880; *Minnesota v. Dickerson,* 508 U.S. 366, 373, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993). We employ an objective standard for determining the officer's reasonableness in a stop. Based upon all the circumstances, the officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *see also State v. Johnson,* 444 N.W.2d 824, 827 (Minn.1989) (holding officer must be able to point to something that objectively supports his position). An officer may make this assessment from inferences that might elude an untrained person. *Cripps,* 533 N.W.2d at 391.

■ As such, officers are given more leeway for stops than arrests. In fact, all that is required is that the stop must not be "the product of mere whim, caprice, or idle curiosity." *State v. Johnson,* 257 N.W.2d 308, 309 (Minn.1977), *quoted in State v. Capers,* 451 N.W.2d 367, 370 (Minn.App.1990), *review denied* (Minn. Apr. 25, 1990). In some instances, a single observation may be sufficient to justify a stop. *State v. DeSart,* 357 N.W.2d 416, 418 (Minn.App.1984). For example, in *Capers,* the defendant argued that the stop was illegal because he presented numerous explanations for his conduct. 451 N.W.2d at 372. The court disagreed, reasoning:

> The officer here was able to be quite specific in articulating the facts of appellant's appearance and conduct * * * which led to the officer's suspicion; the officer was not required to consider every possible interpretation of those facts before stopping appellant.

*Id.* The officer's experience is a fact that weighs heavily in determining reasonable articulable suspicion. *Id.* at 371. Since the officer in *Capers* was able to justify his suspicions, the stop was legal. *Id.* at 372.

■ Similar to *Capers,* appellant in this case argues that his conduct was "innocent." While the average person at the bus station may have been indifferent to appellant's conduct, Officers Bratsch and Pyka were not. Pyka initially became suspicious when he observed appellant walking into the bus de-

pot, looking from left to right. Furthermore, appellant was not carrying any luggage. This behavior was inconsistent with other passengers who did not suspiciously look around the bus depot after exiting the bus. Pyka reported this suspicious behavior to Bratsch who also observed appellant conducting some type of "counter-surveillance." Specifically, appellant and his companion were looking around at everyone and everything in the bus depot. They did not use the phone; they did not meet any acquaintances; and they re-boarded the bus after appellant made eye contact with Pyka. Based on his experience with the narcotics team, Bratsch recognized this type of behavior as being consistent with narcotics trafficking.

The officers were able to articulate on the record the specific facts of appellant's conduct that led to their suspicion. Appellant's behavior, coupled with the officers' experience, was enough to justify a seizure. Therefore, the district court was correct in finding that, based on the totality of the circumstances, the officers had sufficient individualized suspicion to justify a seizure.

## II. Consent to Search

■ Even though the seizure of appellant was justified by reasonable articulable suspicion, appellant contends there still remains the issue of whether he voluntarily consented to the search of his person and his bag. Whether consent to search is voluntary or the product of duress or coercion is a question of fact to be determined from the totality of the circumstances. *State v. Alayon*, 459 N.W.2d 325, 330 (Minn.1990).

■ According to the Fourth and Fourteenth Amendments, searches conducted without a warrant are "per se unreasonable * * * subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). One such exception to the warrant requirement is a search conducted pursuant to consent. *Id.*, at 219, 93 S.Ct. at 2043–44. To support a claim of consent, the state has the burden to prove that the defen-

dant consented freely and voluntarily. *State v. George*, 557 N.W.2d 575, 579 (Minn.1997).

■ Two competing concerns must be accommodated in determining whether consent is, in fact, voluntary. *Schneckloth*, 412 U.S. at 224–25, 93 S.Ct. at 2046. The legitimate need for searches must be balanced against the equally important safeguard of assuring the absence of coercion. *Id.* The Minnesota standard for determining whether consent is voluntary is "whether a reasonable person would have felt free to decline the officers' request or otherwise terminate the encounter." *State v. Dezso*, 512 N.W.2d 877, 880 (Minn.1994) (quoting *Bostick*, 501 U.S. at 436, 111 S.Ct. at 2387)). In determining voluntariness, the court must examine the totality of the circumstances, "including the nature of the encounter, the kind of person the defendant is, and what was said and how it was said." *Id.*

Applying these factors, the court concluded in *Dezso* that the state failed to sustain its burden of proving that the defendant gave consent voluntarily. *Id.* at 881. Even though the officer's tone was civil, the fact that the officer persistently asked questions that were official in nature suggested the encounter was coercive. *Id.* Furthermore, the facts failed to indicate that Dezso was aware he could refuse to let the officers see his wallet. *Id.* Finally, because of the ambiguous nature of the encounter, it was not clear that Dezso voluntarily consented to the search. *Id.* As a result of these factors, the court held that consent was not voluntary. *Id.*

In contrast, the court held the defendant's consent was voluntary in *Alayon*, 459 N.W.2d at 331. There, officers walked up to Alayon's house, pulled out their guns, showed their badges, and ordered Alayon to lie on the floor. *Id.* at 327. After the house was secure, the officers put away their guns, let Alayon stand up, and did not formally place him under arrest. *Id.* Ultimately, when the officers asked permission to search the house, Alayon not only gave the officers permission, he cooperated with the officers in the search. *Id.* at 331.

Although this court is troubled by the circumstances in the present case, we see no authority that supports a finding of involuntary consent. The facts here are distinguishable from *Dezso*. Unlike the defendant in *Dezso*, appellant did not offer equivocal responses. The facts indicate that appellant was clear in his responses to the officers. When Bratsch initially asked appellant if he could search him, appellant replied, "Yes." When asked if he had any bags, appellant said he had a blue bag in the overhead compartment. When the officer asked to search appellant's bag, appellant gave him permission. When Bratsch asked to check appellant's sleeve, appellant said, "Yes." Furthermore, Bratsch informed appellant that the encounter was consensual. Although informing appellant that the encounter was consensual does not equate with informing him he had a right to refuse, it is another factor to be considered in the totality of the circumstances.

Similar to the situation in *Alayon*, appellant was never formally placed under arrest and the officers concealed their guns behind their backs. *See Alayon*, 459 N.W.2d at 330 (holding defendant consented voluntarily after officers put guns away, allowed defendant to stand, and did not handcuff or arrest him). In addition, appellant not only gave the officers consent to search, he also cooperated in the search by lifting his arm up toward Bratsch. Since the record suggests the encounter was consensual at every stage, the district court properly found that appellant consented to the search.

### DECISION

Appellant was seized when the officers confronted him on the back of the bus. The seizure was legal because the officers were able to articulate sufficient facts justifying the seizure. Appellant gave the officers voluntary consent to search his person as well as his belongings. As a result, the district court properly denied appellant's motion to suppress the evidence.

**Affirmed.**