*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1871**

State of Minnesota,
Respondent,

vs.

Terrance Paul DeRoche,
Appellant.

**Filed October 11, 2016
Affirmed
Toussaint, Judge∗
Dissenting, Ross, Judge**

Scott County District Court
File No. 70-CR-14-8041

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Ronald Hocevar, Scott County Attorney, Todd P. Zettler, Nelson L. Rhodus, Assistant County Attorneys, Shakopee, Minnesota (for respondent)

John A. Price III, Lakeville, Minnesota (for appellant)

    Considered and decided by Ross, Presiding Judge; Connolly, Judge; and Toussaint, Judge.

---

∗ Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**TOUSSAINT**, Judge

On appeal from his driving-while-impaired (DWI) convictions, appellant Terrance Paul DeRoche argues that the district court erred in denying his pretrial suppression motion because the officer's stop of appellant's vehicle was not supported by a reasonable, articulable suspicion of criminal activity. Because the district court did not err in concluding that the police officer had a reasonable, articulable suspicion to stop appellant's vehicle, we affirm.

## DECISION

Appellate courts review de novo a district court's determination of reasonable suspicion as it relates to an investigatory stop. *In re Welfare of G.M.*, 560 N.W.2d 687, 690 (Minn. 1997). A district court's findings of fact will not be set aside unless they are clearly erroneous. *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008).

The United States and Minnesota Constitutions protect against "unreasonable searches and seizures." U.S. Const. amend. IV; Minn. Const. art. I, § 10. "A search conducted without a warrant issued upon probable cause is generally unreasonable." *State v. Flowers*, 734 N.W.2d 239, 248 (Minn. 2007). The Fourth Amendment prohibits law enforcement from searching an individual without a warrant, subject only to a few established exceptions. *State v. Varnado*, 582 N.W.2d 886, 889 (Minn. 1998). One exception to the warrant requirement is an investigatory stop, or *Terry* stop, which allows law enforcement to temporarily detain a suspect if an officer has a reasonable, articulable suspicion of criminal activity. *State v. Diede*, 795 N.W.2d 836, 842 (Minn. 2011) (citing

*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)).  The reasonable-suspicion standard is not high, *Diede*, 795 N.W.2d at 843, and "an actual violation is not necessary." *State v. Haataja*, 611 N.W.2d 353, 354 (Minn. App. 2000) (quotation omitted), *review denied* (Minn. July 25, 2000).  "[An] officer must be able to articulate at [an] omnibus hearing that he or she had a particularized and objective basis for suspecting the seized person of criminal activity." *State v. Cripps*, 533 N.W.2d 388, 391 (Minn. 1995).

Recently, the Minnesota Supreme Court decided *State v. Morse*, which involved a traffic stop after a driver made a wide turn and subsequently drifted within a traffic lane. 878 N.W.2d 499, 500 (Minn. 2016).  While there was a question as to whether the driver in *Morse* violated a traffic law, law enforcement stopped him on a suspicion of DWI based on his driving behavior, the time of day, and his location near bars.  *Id*.  While *Morse* is factually different from this case, it is the supreme court's pronouncements that are important: "A trained police officer is entitled to draw inferences on the basis of all of the circumstances[,] . . . inferences and deductions that might well elude an untrained person." *Id*. at 502 (quoting *State v. Johnson*, 444 N.W.2d 824, 826 (Minn. 1989)) (quotation marks omitted).  After analyzing the totality of the circumstances, and giving deference to the officer's inferences and deductions made based on the officer's training, the supreme court concluded that the officer had a reasonable, articulable suspicion to stop the vehicle based on Morse's suspicious driving behavior.  *Id*. at 502–03.

Likewise, here, after examining the totality of the circumstances, and giving deference to the officer's inferences and deductions, we conclude that the stop of appellant's vehicle was valid.  The district court, while recognizing this is a close case,

3

credited the officer's testimony that appellant's conduct was "unusual and suspicious, in light of the ongoing concerns about theft activity in the area." The officer observed appellant driving his vehicle in the early morning hours on a frontage road in a commercial area near a trailer dealership. The officer was aware that the trailer dealership had been burglarized in the past one or two months, and other commercial properties in the area had experienced thefts. The officer observed appellant drive from the frontage road onto a private driveway, 10–15 feet past a sign reading "Private Property. No Trespassing." The vacant property, which occasionally hosts a flea market, is adjacent to the trailer dealership. Appellant's vehicle sat in the driveway for one to two minutes. The area was dark and unlit. When the officer approached in a marked squad to investigate, appellant backed out of the private drive to turn around, and the officer stopped appellant. Based on these circumstances and rational inferences drawn from them, an officer could reasonably suspect appellant of committing property crimes of nearby businesses. This reasonable suspicion justified the officer's stop of appellant's vehicle.

Furthermore, this court has upheld investigatory stops on similar or more minimal facts and circumstances. For example, in *Olmscheid v. Comm'r of Pub. Safety*, this court concluded that a stop was valid when in the early morning hours police stopped a driver leaving a dead-end frontage road that provided access to closed businesses. 412 N.W.2d 41, 42 (Minn. App. 1987), *review denied* (Minn. Nov. 6, 1987). In *Olmscheid*, the officer suspected the driver of property theft because there was a history of theft at a car dealership, which extended along the dead-end frontage road. *Id*. This court reasoned that the officer's knowledge of the previous thefts at the car dealership and "the presence of the vehicle in

4

the early morning hours in a commercial area with no residences on a road that does not connect to another roadway provide an objective and particularized basis for [the officer's] suspicion of criminal activity." *Id.* at 43. In *Thomeczek v. Comm'r of Pub. Safety*, this court concluded that there was sufficient reasonable suspicion of criminal activity when a driver was legally parked on a street with the vehicle's lights on and motor running in an area of residential development, where some homes were unoccupied or being built. 364 N.W.2d 471, 472 (Minn. App. 1985).

Appellant argues that *Olmscheid* and *Thomeczek* are distinguishable because they involved commercial businesses and residential homes susceptible to theft and burglary, while appellant was on a vacant property where there was nothing to steal or vandalize. But appellant's argument ignores the officer's testimony that there were "ongoing issues" with theft in the area, that the nearby trailer business experienced thefts, and that other businesses on the frontage road had scrap metal and other items stolen.

Appellant also argues that unlike *Olmscheid*, in which the officer encountered the vehicle on a dead-end road not knowing how or when it arrived there, the officer here observed appellant before he drove onto the private drive. While this fact may indicate that appellant was lost, an officer of reasonable caution could draw another inference: that appellant's driving behavior at that time of day and at that location was suspicious and indicative of someone who may be involved in property crimes. Furthermore, as the district court noted, the officer found appellant's driving suspicious, "in light of the ongoing concerns about theft activity in the area." Based on the facts and circumstances available to the officer at the time of the stop, which included recent property crimes in the

area, this is the type of inference an officer is entitled to draw, and that might well elude an untrained person unfamiliar with the area.

Appellant's argument that he was stopped for merely being present in a high-crime area and for appearing lost is unavailing because the officer testified that he found appellant's actions suspicious because appellant's vehicle sat for one to two minutes on vacant property marked private, and because appellant began to turn around when the officer approached the vehicle. These are facts in addition to the fact that appellant was in an area that had recently experienced thefts. Thus, appellant was not stopped merely for being present in a high-crime area.

In sum, based on the totality of the circumstances and the permissible inferences made by law enforcement, the stop here was supported by a reasonable suspicion that appellant had been or was in the process of committing property crimes in the area. Thus, the district court did not err in denying appellant's pretrial suppression motion.

**Affirmed**.

**ROSS**, Judge (dissenting)

Reasonable suspicion is a low standard. But it is a standard of *some* degree. If driving briefly just onto a vacant lot somewhere near a different lot where a theft occurred "maybe a month or two" earlier allows police to force a stop for a police investigation, then the standard is virtually meaningless. I respectfully dissent because we must distinguish between a mere "hunch" (undeveloped, vague speculation), which can never justify a police stop, and reasonable, articulable suspicion that a crime has occurred or is about to occur, which does justify a police stop. This is a pure-hunch case.

Terrance DeRoche drove his car eastbound on a dark frontage road and continued straight, barely and momentarily entering a driveway of a completely vacant lot as the road he was on cornered 90 degrees left, and then he backed out onto the road to begin heading north. That is the entire story of DeRoche's conduct. The majority says this story demonstrates reasonable suspicion for police to stop the car because, some unknown number of weeks earlier, somebody stole something from a *different* lot. The majority says this allowed the police officer to "reasonably suspect [the driver] of committing property crimes of nearby businesses" even though the officer never suggested that he suspected any such thing or that he associated the car with the previous theft.

I highlight a concern over the state's representation that the car "stopped and sat for approximately one to two minutes," because this exaggerates the officer's testimony and the documentary evidence. The officer testified that he first saw DeRoche's car while the officer was traveling east on County Road 2 and DeRoche's car was moving east on the parallel frontage road. He said that "as soon as [he] turned onto the frontage road

[from County Road 2] the suspect vehicle started to back out [of the vacant lot and] onto the frontage road" and was "facing north, toward County Road 2." The officer testified that DeRoche's car had "stopped and sat there" on the lot only as long as it took the officer to reach the frontage road. The testimony suggested that DeRoche had already backed onto the frontage road and faced north. He never said exactly how long it took for him to reach DeRoche from the point he first saw him, but when asked, he said only, "*maybe* a minute. . . . *Maybe* two minutes, at the most." (Emphasis added.)

The district court accepted as evidence a Google Map of the area. Although the printed map was not included in the file, we have access to Google Maps, and the map shows that County Road 2 parallels the frontage road only for approximately 0.3 miles, or 1,584 feet, before it reaches the entrance to the vacant lot. The officer said the speed limit on the road is 30 miles per hour. Assuming he first saw DeRoche's car at the earliest possible moment at the outermost end of the frontage road and the two cars were on pace with the speed limit of 30 miles per hour (or 44 feet per second), DeRoche covered the entire distance to the lot in at most just 36 seconds. That's when the officer turned onto the frontage road and immediately saw that DeRoche was *already* backing out of the lot and onto the road, facing north. In other words, the officer's testimony and the documentary evidence establish that DeRoche's car could not have possibly "stopped and sat" on the lot for any more than a brief moment, not two minutes or even one minute. This evidence informs us what the officer meant by "*maybe* a minute." (Emphasis added.)

D-2

The result here should follow two early pure-hunch cases. The first is *Reid v. Georgia*, where the United States Supreme Court reversed the Georgia Court of Appeals because police had acted on a hunch rather than a reasonable suspicion. 448 U.S. 438, 441–42, 100 S. Ct. 2752, 2754 (1980). A drug enforcement officer stopped a man outside an airport terminal supposing that the man was carrying drugs. *Id.* at 440, 100 S. Ct. at 2754. The officer inferred from the way the man walked through the airport that he was trying to hide the fact that he was traveling with a companion and carrying drugs. *Id.* at 439, 441, 100 S. Ct. at 2753–54. The Court described the officer's theory as a mere "inchoate and unparticularized suspicion or 'hunch'" rather than reasonable suspicion of a crime. *Id.* at 441, 100 S. Ct. at 2754 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968)). The *Reid* case actually had more substance than this one; there at least the officer *tried* to fashion a theory as to how the defendant's behavior might suggest that he was engaged in a crime. By contrast neither the arresting officer, nor the district court, nor even the majority today offers any theory as to how pulling barely onto a vacant lot's entrance and then returning to the road implies that the driver may have been involved in "committing property crimes of nearby businesses."

The second case is *State v. Harris*, 590 N.W.2d 90 (Minn. 1999). Police had observed Harris and another man scope out a Greyhound bus depot before boarding a bus, leading officers to suppose that the men were drug couriers and to board the bus and gain their permission to look in their bags. *Harris*, 590 N.W.2d at 95. This court believed that the officers reasonably suspected drug transportation based on the following detailed circumstances and their inculpatory inferences:

> [The first officer] initially became suspicious when he observed appellant walking into the bus depot, looking from left to right. Furthermore, appellant was not carrying any luggage. This behavior was inconsistent with other passengers who did not suspiciously look around the bus depot after exiting the bus. [The officer] reported this suspicious behavior to [another officer] who also observed appellant conducting some type of "counter-surveillance." Specifically, appellant and his companion were looking around at everyone and everything in the bus depot. They did not use the phone; they did not meet any acquaintances; and they re-boarded the bus after appellant made eye contact with [the officer]. Based on his experience with the narcotics team, [one of the officers] recognized this type of behavior as being consistent with narcotics trafficking.

*State v. Harris*, 572 N.W.2d 333, 337–38 (Minn. App. 1997), *aff'd on other grounds*, 590 N.W.2d 90 (Minn. 1999). The supreme court disagreed. It noticed that this court overlooked (like the majority today overlooks) the fact that the suspects' behavior was quite consistent with *non*criminal activity. *Harris*, 590 N.W.2d at 100–01. It reversed this court's reasonable-suspicion holding and determined that the officers "were acting on a mere hunch that Harris was transporting a controlled substance" and therefore lacked reasonable suspicion that he actually was transporting drugs. *Id.* at 101.

The officers in both those cases had far more to be suspicious about than the officer here. And in those cases the United States and Minnesota Supreme Courts marked the distinction between a speculative hunch and an articulable suspicion, rejecting the lower courts' conclusions that reasonable suspicion existed.

The majority now relies chiefly but mistakenly on a principle that the state supreme court previously adopted from the United States Supreme Court and recently repeated: "[A] trained police officer is entitled to draw inferences on the basis of all of

the circumstances[, including] inferences and deductions that might well elude an untrained person." *State v. Morse*, 878 N.W.2d 499, 502 (Minn. 2016) (quoting *State v. Johnson*, 444 N.W.2d 824, 826 (Minn. 1989) (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 695 (1981))). That principle does not apply here.

While a trained police officer surely is "entitled" to draw inferences and deductions that might elude an untrained person, this entitlement is of course not relevant when the officer never presents any inferences or deductions whatsoever. Indeed, when the state supreme court adopted the maxim in its 1989 *Johnson* case, it did so expressly distinguishing a 1977 *Johnson* case that, like this case, involved an officer who did not articulate any relationship linking the supposedly suspicious conduct to the suspected crime. *Johnson*, 444 N.W.2d at 827. The supreme court said, "Th[is] case is thus distinguishable from *State v. Johnson*, 257 N.W.2d 308 (Minn. 1977), where, although there was some indication in the record that the officer may have observed what might be termed 'an evasive maneuver' by the driver, the officer was totally unable to articulate at the omnibus hearing why he became suspicious of the vehicle." *Johnson*, 444 N.W.2d at 827. This analysis teaches that we can never rely on an officer's unique training and experience to find reasonable suspicion when the officer failed to "articulate at the omnibus hearing *why* he became suspicious." *Id.* (emphasis added).

The majority wrongly says that it is "giving deference to the officer's inferences and deductions" here because the officer made no inferences or deductions. The prosecutor never asked him to, and he never "articulate[d] . . . why he became suspicious of the vehicle." *Id.* We do not know what crime, if any, the officer suspected. He could

not have testified about his suspicion more vaguely, saying only this: "It was suspicious and out of the ordinary." *Why* was it "suspicious?" *What* was "out of the ordinary" about continuing straight onto a driveway (from a road that turned sharply left), pausing only momentarily, and then returning to the road?

The officer never suggested it, but the majority opines that this conduct was suspicious because of a prior business theft. The prosecutor never asked the officer to say what he was suspicious about; he instead asked vaguely only whether there had been "any activity in that area" that he was "made aware of as a police officer." The officer said, "No, not in that area there." The prosecutor pressed further and the officer then said that, weeks earlier, someone had stolen propane tanks and car batteries from a business down the road from the lot where the stop occurred. What would lead an officer to *reasonably* suppose that, by pulling a car just onto a vacant lot for "maybe a minute . . . two minutes, at the most," the driver likely was involved in the theft of propane and batteries *from some different lot* "maybe a month or two prior" to that? Would he reason that the propane-tank bandit had run out of propane and was planning another heist? Does his law-enforcement experience inform him that a burglar intending to steal propane would park that far away and lug his stolen full tanks across one or two business lots back to his car? These extrapolations arise from the officer's unique training? We have no explanation from the officer, the district court does not suggest any rationale, and the majority provides only the conclusory (and factually inaccurate) declaration that the officer actually drew "inferences and deductions" that led him to "reasonably suspect [the driver] of committing property crimes of nearby businesses." If the suspicion that links

D-6

DeRoche's momentary stop to "property crimes" on a different lot months earlier is truly reasonable, why does no one who advocates the connection try to explain it?

The majority states that "this court has upheld investigatory stops on similar or [fewer] facts and circumstances," citing two cases. But neither cited case was issued after the supreme court in *State v. Harris* applied the no-mere-hunch distinction or after its 1989 *Johnson* opinion that explained what happens when an officer fails to "articulate at the omnibus hearing why he became suspicious." *Johnson*, 444 N.W.2d at 827.

I add that I do not agree that the cited case of *Olmscheid v. Commissioner of Public Safety* was weaker on suspicion than this case. 412 N.W.2d 41, 42 (Minn. App. 1987), *review denied* (Minn. Nov. 6, 1987). In *Olmscheid*, the testifying officer did not state, as the officer here stated, merely that the car was "suspicious." *Id.* The officer said *why* the car was suspicious. *Id.* He explained that he was patrolling in the area because of the thefts. *Id.* He explained the relationship between the road where he stopped the car and the car dealership with the history of burglary. *Id.* And he explained that the dead-end road serviced only a closed recycling facility, a closed storage facility, and the closed car dealership. *Id.* It is not much of a connection, but unlike this case, the officer actually explained his suspicion in connection to the circumstances.

I agree that *Thomeczek v. Commissioner of Public Safety*, 364 N.W.2d 471 (Minn. App. 1985), likely involved as minimal a showing of suspicion as occurred in this case. The brevity of *Thomeczek*'s factual description and analysis makes it impossible to know. But it does not matter; neither *Thomeczek* nor *Olmscheid* helps the holding today because both cases predate the supreme court's clear application of the no-hunch rule in *Harris*

and its reasoning in *Johnson* requiring the officer to provide the inferences and deductions linking the purportedly suspicious conduct to the suspected crime.

We should reverse.