STATE of Minnesota,
Petitioner, Appellant,

v.

Rolando Thomas ALAYON, Respondent.

No. C5–89–1768.

Supreme Court of Minnesota.

Aug. 10, 1990.

Rehearing Denied Sept. 12, 1990.

Phillip S. Resnick, Resnick & Patterson, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Tom Foley, Ramsey County Atty., Darrell C. Hill, Asst. Ramsey County Atty., St. Paul, for respondent.

YETKA, Justice.

This appeal raises a number of fourth amendment issues, including when police may make a limited sweep of a residence to preserve evidence pending the issuance of a search warrant and what scope of review is appropriate when an appellate court reviews a trial court's determination that consent to search without a warrant was "voluntary." After considering these issues (and all the issues addressed by the parties in their briefs), we conclude that the court of appeals erred in reversing defendant's convictions of distribution of cocaine, possession of cocaine with intent to distribute and two counts of failure to affix tax stamps. Accordingly, we reverse the decision of the court of appeals and reinstate the judgment of conviction.

On March 29, 1989, Sergeant Francis Zaruba, an undercover narcotics officer with the St. Paul Police Department, met with two men, one of whom was later identified as Robert Laynugh. They went to an alley at the rear of a residence at 1092 East Rose on the East Side. Laynugh went inside and returned with a man later identified as Murl Jones. Jones said that his nearby source of cocaine was "out" and they would have to go to the West Side. He directed them to meet him in 20 minutes at the parking lot at Awada's on Plato, east of Wabasha. When Zaruba and his party arrived at Awada's, they were met by Jones, who was with a second man, in a Ford LTD. Jones told Zaruba that they wanted the money for the cocaine (⅛ of an ounce) "up front." Zaruba refused. Jones said that the price would then increase from $225 to $250. Zaruba finally agreed to pay $235. Jones and his passenger, later identified as Josè Espinoza, then drove off. Other undercover officers who were on surveillance detail followed the LTD to an area about ¾ to 1 mile away. One of the officers, Carter, saw Espinoza exit the car and walk to a residence on East King. From his vantage point, Carter could see only that Espinoza went into one of two houses, either the one at 81 East King or the one at 83 East King. Espinoza returned to the LTD a short time later, and Jones and he drove back to Awada's, where the exchange of cocaine for money took place. Jones gave some of the money to Laynugh and then left with Espinoza.

The next day, March 30, Zaruba called Jones at Awada's and discussed buying an ounce of cocaine for $1,500. Jones agreed to meet with him in the lot at Plato and Robert that afternoon. Accompanied by Berg, a female undercover officer, Zaruba drove there and pulled up next to Jones and Espinoza, who were in the LTD; Espinoza had a child with him this time. Jones again said that they wanted the money up front, and Zaruba again refused. Jones offered to let Zaruba ride with them to an undisclosed location, but Zaruba said "no." Finally, they agreed that Zaruba could follow them to the area. When they arrived at Stevens, just south of Livingston near East King, Jones again asked for the $1,500 up front. Zaruba said "no," but gave Jones $50 up front as a gesture of good faith. Espinoza then walked south on Livingston to King, where he turned left and began walking east. Carter, in his surveillance position, knew that Espinoza entered and exited from either 81 East King or 83 East King. His "best guess" was that Espinoza entered 81 East King, a house with a porch and the front door blocked by pillars; he felt that, had Espinoza entered 83 East King, he would have seen the unblocked screen door open and close.

When Espinoza returned 5 minutes later, he first got into Jones's car. Then Jones took the cocaine to Zaruba. Zaruba, who was "bugged," gave a prearranged signal, and the surveillance officers moved in and arrested both Jones and Espinoza. After asking Espinoza what his name was, Officer Neil Nelson, an undercover officer, took the $1,500 in cash and walked to 81 East King, the house which, according to Carter's "best guess," was the one Espinoza had entered to get the cocaine.

When Nelson knocked on the door, he heard a female voice inside the house describe him to someone else. Then defendant, Rolando Alayon, who apparently is from Cuba, came to the door and opened it. Nelson said that "Josè" (Espinoza) had sent him with the money. Defendant frowned and then glanced past Nelson, looking towards the street. Nelson said that he was "in the car when the deal went down" and that Josè had gotten into a fight and asked him to deliver the money. Nelson displayed the money as he said this. At that point, defendant nodded his head as if saying yes and started coming outside and closing the door behind him.

Convinced at that point that 81 East King was the house Espinoza had entered and that defendant was connected in some way to the sale, Nelson pulled a gun, showed his badge and ordered defendant to lie down on the floor. As defendant lay down on the threshold and other surveillance officers began approaching the house, Nelson entered the house with the intention of securing the premises and preventing the destruction of evidence by those who were in the house, pending application for the issuance of a search warrant. As part of his efforts to secure the house, Nelson ordered the two women who were seated in the living room to stay seated and then made a brief 60–second "sweep" of the house. He found a male teenager also in the house. Nelson and the other officers then put their guns away and let defendant stand up. Neither Nelson nor any of the other officers either handcuffed defendant or told him that he was under arrest.

Nelson talked first to one of the women, Miriam Montanez. He asked her if it was her house and if she paid the rent. She said "yes" to both questions. Nelson asked her if he could search the house. Nelson denied coercing her or threatening her in any way. She not only said that he could search the house, but also assisted him when the search began. Montanez acted as translator when Nelson spoke with her cousin, Luz Cotto, a 20–year–old woman who lived elsewhere in St. Paul and apparently was just visiting.

Before commencing the search, Nelson also spoke with defendant, who, like Montanez, did not need an interpreter. Defendant said that Nelson could search the house, and, when asked if cocaine was in the house, said it was on top of the cabinet in the kitchen. When Nelson looked inside the cabinet, defendant said, "No, on top."

After finding cocaine there, Nelson gave defendant a *Miranda* warning and arrested defendant. Defendant asked a number of questions about the warning, and Nelson explained it carefully before obtaining a waiver. Defendant told Nelson about his involvement in the offense and pointed out other items in the house related to drug dealing, including a scale and another bag of cocaine, a bag which defendant said that Espinoza had left as collateral because Espinoza had not paid him yet for the ounce sold to Zaruba. Defendant said that he had sold the cocaine to Espinoza for $600. He said that the scales and cocaine were his, not Montanez's or her cousin's. Police also found a .22 caliber rifle and a clip in the search of the house. In a search of defendant's person incident to the arrest, they found a large amount of cash.

Defendant was charged with distribution of cocaine, possession of cocaine with intent to distribute, and two counts of failure to affix tax stamps. After the trial court denied defendant's motion to suppress on fourth amendment grounds, defendant waived his right to a jury trial and agreed to be tried on stipulated facts. The trial court found defendant guilty as charged and sentenced him to concurrent terms of 32 months for distribution of cocaine and

21 months for one of the counts of failure to affix tax stamps. The court of appeals reversed all of defendant's convictions, concluding that the trial court erred in denying the motion to suppress. *State v. Alayon,* 454 N.W.2d 629 (Minn.App.1990). We reverse the decision of the court of appeals and reinstate the judgment of conviction.

(a) As a starting point, we note that, when Espinoza returned with the cocaine on the 30th, Zaruba was faced with a difficult field decision as to what to do next in his investigation. Obviously, if the police were only after Espinoza, they could have arrested him on the 29th, but they were interested in going one step up the distribution ladder and getting the supplier, for whom Espinoza apparently was working as a runner. They tried to find out the address of the supplier on the 29th and again on the 30th but were unsuccessful. Carter, who had Espinoza under surveillance, could say only that his "best guess" was that Espinoza entered 81 East King rather than 83 East King to get the drugs. With this information alone, the police probably could not have obtained a warrant to enter and search the residence at 81 East King. The question, therefore, was what to do? One option would have been to give Espinoza the $1,500 in cash and hope that the police could follow him and learn the precise address. This might or might not have worked. Another option, the one that the police took, was to arrest Espinoza and then, through the ruse used by Nelson, try to determine if Carter's "best guess" was correct.

(b) Nelson, of course, did not need a warrant or probable cause to walk up to defendant's house, knock on the door and say the things he said. Relevant decisions of this court include *State v. Crea,* 305 Minn. 342, 233 N.W.2d 736 (1975) (holding that police without a warrant or probable cause may walk on sidewalk and onto porch of a house—areas of curtilage that are impliedly open to public—and knock on door in an attempt to get suspect to talk voluntarily with them), and *State v. Buchwald,* 293 Minn. 74, 196 N.W.2d 445 (1972) (upholding undercover officer's use of ruse and knocking on door to possible suspect's hotel room).

(c) Defendant did not have to open the door. If defendant had suspected that Nelson was a police officer and had chosen not to open the door, Nelson could not have done anything and defendant, free to act on his suspicions, probably would have disposed of or moved his remaining supply of cocaine to another location shortly thereafter. Defendant freely chose to open the door and stood in the open doorway, which the United States Supreme Court and this court have held to be a "public" place for fourth amendment purposes. *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *State v. Howard,* 373 N.W.2d 596 (Minn.1985).

(d) Nelson learned what he needed to know while talking with defendant. Defendant is Hispanic, and so is the "runner," Espinoza. Defendant's responses to Nelson's statements justified Nelson's belief that defendant was connected to the transaction. While talking with Nelson, defendant looked suspiciously towards the street as if checking out who was in the area. Defendant also nodded his head, as if saying "yes," and started to come out of the house when Nelson displayed the money. We conclude that, at that point, Nelson had probable cause to believe the cocaine had come from this house and that there was more cocaine in the house. *See State v. Bigelow,* 451 N.W.2d 311 (Minn.1990) (holding that lawful discovery of drugs justifies search which might result in discovery of more drugs or other contraband). Although we need not decide the issue, Nelson may have had probable cause to arrest defendant. If so, he could have arrested defendant in the open doorway without violating *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (physical entry into the home for purpose of warrantless arrest constitutes violation of individual privacy rights). *State v. Howard,* 373 N.W.2d 596 (Minn.1985) (defendant standing in open doorway is in public place for fourth amendment purposes). At a minimum, Nelson clearly had articulable suspicion justifying the forced temporary

detention of defendant under the *Terry* line of cases. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[1]

■ (e) Whether defendant was under arrest or merely being detained at that point, the next question is the same: Could Nelson enter the house without a warrant for the limited purpose of securing the premises and preventing the destruction of evidence by those who were in the house pending application for and issuance of a search warrant? In *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), the police, who had an arrest warrant, arrested the defendant on a narcotics charge outside his house, then entered and made a cursory check of the house to see if anyone was present. When the defendant's mother and brother entered, the police searched the house for and found narcotics. The United States Supreme Court held that the warrantless search of the house was unconstitutional and that the arrest of defendant on the street did not provide its own exigent circumstances so as to justify a warrantless search of the house for drugs. The case is analyzed in detail at 2 W. LaFave, *Search and Seizure* § 6.5(a) (1987). *Vale* might well apply to this case if the police simply had entered the house and had begun searching for drugs immediately. *Vale,* however, does not apply to what the police did here.

The United States Supreme Court's recent decision in *Maryland v. Buie,* —— U.S. ——, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), deals with a quick protective sweep of a house subsequent to an in-house arrest. The Court there held that such a sweep is far different from what is referred to as a "top-to-bottom" search and may be commenced when justified by a reasonable, articulable suspicion, *i.e.,* the *Terry* standard, that the house is harboring a danger to those on the arrest scene. The case dealt with an in-house arrest and did

not address the situation posed by an arrest either at the threshold or right outside the house. It also dealt only with a sweep for the purpose of protecting the officer's safety.

The sweep in this case was primarily a sweep for the purpose of rounding up those inside the house who would be aware of the seizure of defendant that occurred just outside the house in their conscious presence, *i.e.,* people who might destroy whatever cocaine and other evidence was in the house while the police were obtaining a search warrant. Fiske, *Clean Sweeps: Protecting Officer Safety and Preventing the Imminent Destruction of Evidence,* 55 U.Chi.L.Rev. 684 (1988), contains an excellent analysis of the issue. Fiske takes the position that a higher standard, not the *Terry* standard used in *Maryland v. Buie,* should govern when the sweep is to preserve evidence. Specifically, Fiske argues that the test should be probable cause plus exigent circumstances, that is, probable cause that there is evidence in the residence and that the evidence is in danger of imminent destruction. *Id.* at 715–19. Fiske argues further that the rule does not automatically foreclose sweeps to preserve evidence when the arrest occurs outside the house. Fiske argues that "where the police have probable cause to believe there is a third party on the premises who knows of the impending or actual arrest, they will have sufficient cause to believe that evidence is threatened with almost certain destruction." *Id.* at 717.

Professor LaFave's thinking appears to be substantially in accord, at least for purposes of deciding this case. *See* 2 W. LaFave, *Search & Seizure* § 6.5(b) at 665 (new text) (2d ed. 1987 and Supp.1990). *See also id.* section 6.5(c) at 676 where, interpreting *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), LaFave says:

---

1. Nelson did not formally place defendant under arrest at that point and the fact that he pulled out a gun, identified himself and ordered defendant to lie down does not necessarily mean that defendant was under arrest. *See, e.g., State v. Nading,* 320 N.W.2d 82 (Minn.1982) (ordering suspect to lie on ground did not con-

vert what was intended at that point to be a detention into an arrest), *Johnson v. Morris,* 453 N.W.2d 31, 37 n. 10 (Minn.1990) (approving citation to Model Code of Pre-Arraignment Procedure position that police may use as much force as is reasonably necessary in detention context).

All members of the Court appear to agree that the mere seizure of the premises and contents (that is, a mere interference with possessory interests) is permissible on probable cause even absent exigent circumstances. * * * All members of the Court also appear to accept the proposition that a search (*i.e.*, entry) of the premises to facilitate the impoundment requires *both* probable cause and exigent circumstances.

*See also id.* section 6.5(b) at 666, where LaFave states that "there seems to be no basis for limiting warrantless searches to save evidence to cases where the police are already within" the premises.

We need not decide whether a higher standard, not the *Terry* standard used in *Maryland v. Buie*, should govern when the sweep is to preserve evidence. In this case, the police had probable cause to believe that there was evidence in the house and that it was in imminent danger of destruction while they obtained a warrant. Therefore, an impoundment of the house was justified, along with a brief sweep of the house, to prevent destruction of evidence.

■■■ (f) This takes us to the court of appeals' conclusion that any exigency which might have existed was created by the police. Obviously, if the police had not arrested Espinoza and did what they subsequently did, there would have been no exigency; but, as LaFave says, that is not the test. 2 W. LaFave, *Search & Seizure* § 6.5(b) at 662 (2d ed. 1987). We believe that the appropriate test is whether, on the one hand, the exigent circumstances were unnecessarily or deliberately produced by the police or, on the other hand, the exigent circumstances merely were created by the police using what LaFave refers to as "a quite logical investigative technique under the circumstances." *Id.* One can second-guess the conduct of the police in this case in arresting Espinoza when they did, but they were "in the field" and had to make a quick decision either to arrest Espinoza or pay him the $1,500 and let him go. Once they arrested Espinoza, everything else they did falls, in our opinion, under the category of, as LaFave puts it, "quite logical investigative techniques." In short, we believe that this is not the kind of case involving unnecessary or deliberate creation of exigent circumstances.

■■■ (g) This brings us to the issue of whether the police were justified in searching the house pursuant to the consent given them by both defendant and Montanez. As *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), held, consent to search need only be voluntary, that is, uncoerced, and need not be knowing or intelligent. The standard "quite clearly focuses on whether the police behaved coercively." Stuntz, *Waiving Rights in Criminal Procedure*, 75 Va.L. Rev. 761, 787 (1989). Further, as the Supreme Court expressly said in *Schneckloth*, "the question whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, *is a question of fact to be determined from the totality of all of the circumstances.*" 412 U.S. at 227, 93 S.Ct. at 2047 (emphasis added). The appropriate review standard, therefore, is whether the trial court "clearly erred."

The court of appeals, in its decision, said that the consent was given in "a room full of police officers with drawn guns and no attempt to secure a search warrant—indeed, not even a phone call to see if a judge was available." *State v. Alayon*, 454 N.W.2d 629, 633 (Minn.App.1990). The latter point has no relevance to whether the consent was voluntary. The first point, that the guns were drawn, is in disregard of the trial court's express finding that the officers had all put away their guns. (It was a defense witness who testified that the guns were still drawn and that defendant was wearing handcuffs, but the trial court expressly rejected that witness's testimony and credited the testimony of the police to the contrary.) In fact, the police no longer had their guns drawn; they had let defendant stand up and had not handcuffed defendant or even formally placed him under arrest. Also, the police testified that they did not use any coercion or duress, testimony which the trial court credit-

ed. After talking with Montanez and getting her consent, they asked defendant if they could search the house. Defendant not only consented, but cooperated in the search of the house, helping the officers find the cocaine. The trial court found that the consent was voluntary, and we believe that the court of appeals erred in disregarding that determination. *See State v. Hanley,* 363 N.W.2d 735 (Minn.1985) (upholding trial court's finding of voluntary consent to search even though the officer, although not threatening to get a search warrant, did say that a search warrant could be or would be obtained).

(h) The search of defendant's person was obviously valid as a search incident to the formal arrest of defendant following the consent search of the house.

(i) The trial court obviously did not err in concluding that defendant made a knowing, intelligent and voluntary waiver of his *Miranda* rights and that, therefore, the statements he made were admissible.

In summary, our analysis of this case, based on the facts as found and the cases of both the United States Supreme Court and this court, leads us to the conclusion that the court of appeals erred in reversing the judgment of conviction. Accordingly, we reverse the decision of the court of appeals and reinstate the judgment of conviction.

Reversed and judgment of conviction reinstated.