**STATE of Minnesota, Respondent,**

v.

**Oluseyi HARRIS, petitioner, Appellant.**

**No. C1-97-2.**

Supreme Court of Minnesota.

March 11, 1999.

Steven P. Russett, Assistant State Public Defender, St. Paul, for appellant.

Michael Hatch, Attorney General, Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant Ramsey County Attorney, St. Paul, for respondent.

## OPINION

PAUL H. ANDERSON, Justice.

Oluseyi Harris appeals his conviction for fifth-degree possession of a controlled substance with intent to distribute. Saint Paul narcotics officers arrested Harris in the course of a drug interdiction operation at the Saint Paul Greyhound Bus Depot. At the time of his arrest, Harris was a passenger on an interstate bus that had made a scheduled stopover in Saint Paul. During the stopover, Harris exited the bus, entered the depot, acted in a manner that the narcotics officers characterized as suspicious, and then reboarded the bus. The officers followed Harris onto the bus and asked for consent to search his person, his carry-on bag, and then his person for a second time. Harris complied with each of these requests to search. During their searches, the officers found marijuana and marijuana packaging materials. They then arrested Harris and charged him with possession of a controlled substance with intent to distribute.

Harris sought to suppress all evidence gathered against him on the grounds that: (1) under the Minnesota Constitution, he was illegally seized when the officers boarded the bus and (2) he did not consent to the searches. The district court denied Harris' request, holding that the searches were consensual and that there was no illegal seizure. The court went on to state that, even if Harris did not consent to the searches, the evidence was still admissible because the officers had reasonable articulable suspicion that Harris was transporting a controlled substance. The Minnesota Court of Appeals affirmed, holding that Harris consented to the searches and that the officers had reasonable articulable suspicion. But the court of appeals concluded that the officers seized Harris when they confronted him at his seat in the bus. We affirm, but on different grounds.

In an effort to curb the flow of controlled substances coming into Saint Paul from other states, members of the Saint Paul Police

Department's narcotics unit periodically engage in drug interdiction operations. These drug interdiction operations often target buses arriving from or leaving for Detroit, Chicago, Madison, or Minneapolis. Two or three narcotics officers, plainclothes K–9 officers with dogs trained to detect controlled substances, and uniformed officers are usually involved in each interdiction. According to one of the officers who arrested Harris, officers involved in interdictions generally look for persons who get off the bus with only a small carry-on bag or with no luggage at all, look around to see if any police and drug dogs are present, enter the bus depot, and appear extremely nervous. Sometimes these persons make a telephone call, leave the depot by another means of transportation, or reboard the bus.

Officers Michael Bratsch and John Pyka are members of Saint Paul's narcotics unit. Bratsch has been a Saint Paul police officer for eight years and regularly participates in the police department's bus-based drug interdictions. In describing the process he uses as an interdiction officer, Bratsch explained that he does not use warrants to perform these interdictions because "[i]t's all consensual." When Bratsch believes that a bus passenger may be transporting a controlled substance, Bratsch and another officer first approach the passenger. Bratsch then shows his badge to the passenger, introduces himself as a Saint Paul narcotics officer, and explains to the passenger that Saint Paul is experiencing problems with narcotics entering the city via the bus. Bratsch next asks the passenger if he or she is transporting any narcotics, weapons, or large amounts of currency and then advises the passenger that any cooperation is purely consensual. At this time, Bratsch also requests permission to search the passenger. If the passenger consents to this search, Bratsch asks for permission to search the passenger's bags as well. According to Bratsch, approximately 99% of passengers he approaches during these interdictions consent to his requests to search their persons and bags.

At trial, Harris stipulated to the facts of his arrest as set out in the court file, which file included Bratsch's and Pyka's police reports, and to Bratsch's pretrial *Rasmussen* hearing testimony. These stipulated facts as set forth below are critical to our analysis of the legal issues raised in this case. On the morning of May 23, 1996, Bratsch and Pyka were on duty at the Saint Paul Greyhound Bus Depot, investigating information provided to them by a concerned citizen that controlled substances were being transported on buses traveling between Chicago and Minneapolis. When a Greyhound bus traveling from Chicago to Minneapolis made a scheduled stopover at the depot at approximately 10:30 a.m., Bratsch and Pyka observed appellant Oluseyi Harris and another man exit the bus and enter the depot. Another plainclothes officer, but no uniformed officers, were present in the depot at that time. It also appears that a K–9 officer and his dog were present in the depot. Pyka told Bratsch that Harris and the other man were conducting "counter surveillance" in the depot. Bratsch then observed what he, as a result of his police training, described as counter surveillance activities. He described the activities as follows:

> They got off the bus. They kind of looked around to see who's inside the depot. They didn't use a phone. They didn't get a can of pop. They wanted to see who was around and they boarded the bus * * * [I]t appeared to me that they wanted to see who was inside. They were kind of looking at us, um, looking at Sergeant Pica [sic], um, looking at the dog.

Bratsch stated that, unlike Harris, no other passengers who exited the bus appeared to be as concerned with the presence of Bratsch, Pyka, and the narcotics dog.

After Harris and the other man reboarded the bus, Bratsch and Pyka also boarded the bus. Bratsch stated that he walked to the rear of the bus, stood in the middle of the aisle, and showed his badge to all the passengers. Bratsch then told all the passengers that there was a drug problem in Saint Paul, that many narcotics were entering the city from cities outside Minnesota via bus, and that he and Pyka would like to speak with them individually to inquire whether anyone might be transporting any weapons, narcotics, or large amounts of currency. Bratsch

testified that he was "pretty sure" that he then informed the passengers that "this is consensual." Both Bratsch and Pyka were in plainclothes and, while both were armed, neither displayed his weapon to any of the passengers.

Bratsch next approached Harris, who had chosen to sit in the back row of the bus. Harris stands approximately 5'7" tall and weighs around 145–150 pounds. Bratsch stands 5'9" tall and weighs approximately 200 pounds. Bratsch first asked Harris where he was coming from, where he was going, and how old he was. Bratsch then advised Harris that "this was all consensual" and asked Harris if Harris was transporting any narcotics, weapons, or large amounts of currency. Harris responded that he was not. In a "low key * * * easy-going tone," Bratsch next asked for permission to search Harris' person. According to Bratsch, Harris consented to this search. Bratsch then conducted a thorough pat-down search of Harris' person, including the outsides of the front and rear pockets of Harris' pants and the outsides of the pockets of Harris' jacket. Finding no narcotics, weapons, or large amounts of currency, Bratsch advised Harris that he could "have a seat."

Bratsch then asked Harris whether he had any luggage on board. Harris stated that he had a carry-on bag in one of the overhead compartments. Bratsch retrieved Harris' carry-on bag, confirmed that the bag belonged to Harris, and asked Harris for permission to search the bag. Again, according to Bratsch, Harris consented to the search.

Upon searching Harris' bag, Bratsch found two baggies, each containing approximately 40 to 75 plastic bindles—small sealable plastic bags commonly used to package marijuana for sale. As soon as Bratsch found the bindles, he confronted Harris, telling Harris that he knew such bindles are used to package narcotics. Bratsch's police report and testimony differ as to what happened next. Bratsch either told Harris "to tell me where the narcotics are" or said "if you have narcotics on you, to give them up, tell me." Bratsch testified that, at this point, Harris was extremely nervous, looking around, breathing hard, and trying to hide his left arm.

Bratsch testified that, as a result of Harris' nervous behavior, he was unsure whether Harris had a gun underneath his seat. Fearing for his own safety, Bratsch told Harris that, "for officer's safety reasons," he wanted to see Harris' left arm, the arm Harris had been trying to hide. Harris laid his arm on his lap, whereupon Bratsch noticed a bulge in the left sleeve of Harris' jacket. When Bratsch asked Harris what was in the jacket sleeve, Harris responded that he did not know. Bratsch then asked Harris if he could "check it" and Harris held up the left arm of his jacket and said that, yes, Bratsch could search the sleeve of the jacket. Bratsch stated that he next reached into the left sleeve of Harris' jacket "through the arm and pulled out a large baggy of marijuana." The baggy contained "eight- or nine-ounce bags" of marijuana. Bratsch stated that he believed the marijuana in one of these smaller bags was packaged in bindles and that those bindles were the same type Bratsch had found in Harris' carry-on bag. Harris then started to stand up and Bratsch told him to sit down and that he was under arrest. After a short skirmish in which Harris struck Pyka in the chest and Bratsch struck Harris in the eye, Harris was taken into custody and charged with fifth-degree possession of a controlled substance with intent to distribute, in violation of Minn.Stat. § 152.025, subs. 1(1) and 3 (1996).

At his pretrial *Rasmussen* hearing, Harris argued that all evidence gathered against him should be suppressed because he was illegally seized and because he did not voluntarily consent to any of the searches of his person or his carry-on bag. When the district court denied Harris' motion, Harris submitted his case to the court for a decision on the stipulated facts. As previously noted, the stipulated facts pertinent to our determination were set forth in Bratsch's and Pyka's police reports and in Bratsch's testimony at the *Rasmussen* hearing.

The district court found Harris guilty as charged. The court concluded that Harris was not illegally seized because, when Bratsch and Pyka observed Harris' suspi-

cious behavior in the bus depot, they had reasonable articulable suspicion that Harris might be transporting a controlled substance and that all of the searches were made with the specific consent of Harris. The court also concluded that Harris was not seized until after Bratsch found the marijuana in Harris' jacket sleeve.

The court of appeals upheld both the district court's denial of Harris' motion to suppress and Harris' conviction. The court of appeals agreed with the district court's conclusion that Harris was not illegally seized and that Harris consented to all the searches. The court also concluded that, based on their observations of Harris in the depot, Bratsch and Pyka had reasonable articulable suspicion that Harris might be transporting a controlled substance. However, the court of appeals held that, under the Minnesota Constitution, Harris was actually seized when Bratsch and Pyka confronted him at his seat at the back of the bus. Harris appeals both the denial of his motion to suppress and his conviction. Harris asserts that, under the Minnesota Constitution, he was per se seized when Bratsch and Pyka boarded the bus or, alternatively, when they confronted him at his seat, because at neither time did they have reasonable articulable suspicion that Harris was transporting a controlled substance. He also asserts that he did not voluntarily consent to any of Bratsch's requests to search.

## I.

If Harris was seized at any point before the police officers had reasonable articulable suspicion to seize him, then he was illegally seized and any evidence gathered thereafter must be suppressed. *See State v. Cripps*, 533 N.W.2d 388 (Minn.1995). Article I, Section 10 of the Minnesota Constitution provides "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated." This provision is identical to the provision against unreasonable searches and seizures found in the Fourth Amendment to the United States Constitution. U.S. Const. amend. IV.

Initially, it must be noted that the protection Harris seeks—that he was necessarily seized when the officers boarded the bus—is not available to him under the U.S. Constitution. Indeed, the United States Supreme Court decided, in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), that a seizure does not occur *per se*, for purposes of the Fourth Amendment, merely because an encounter between a citizen and the police takes place on a bus. *Id.* at 439–40, 111 S.Ct. at 2388-89. Previously, in *I.N.S. v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), the Supreme Court concluded that workers in a factory were not seized under the Fourth Amendment when Immigration and Naturalization Service (INS) agents stood at each of the factory doors and other INS agents approached individual workers and asked them questions relating to their citizenship. *Id.* at 218–220, 104 S.Ct. at 1763-65. Because Harris was not seized under the Fourth Amendment, he asks this court to construe the Minnesota Constitution as providing greater protections against unreasonable searches and seizures than does the U.S. Constitution.

A decision of the Supreme Court interpreting a provision of the U.S. Constitution that is identical to a provision of the Minnesota Constitution is of persuasive authority to this court. *See State v. Hamm*, 423 N.W.2d 379, 382 (Minn.1988). However, it is well established that a state supreme court may interpret its own state constitution as protecting individual rights to a greater extent than does the U.S. Constitution. *See PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980). State supreme courts, as the highest courts in their states, are "the first line of defense for individual liberties within the federalist system," and are responsible, independent of the U.S. Constitution, for protecting the rights of their states' citizens. *State v. Fuller*, 374 N.W.2d 722, 726 (Minn. 1985). Indeed, many principled bases have been articulated for state courts to construe their state constitutions as more protective than their federal counterparts, including: variations in text, constitutional history, early state precedent construing the applicable provision of the state constitution, related-

ness of the subject matter to state-level enforcement, presence of issues that are unique to the state, and a determination that a more expansive reading of the state constitution represents the better rule of law. *See* Terrence J. Fleming and Jack Nordby, *The Minnesota Bill of Rights: "Wrapt in the Old Miasmal Mist,"* 7 Hamline L.Rev. 51, 63–77 (1984). "This, of course, does not mean that we will or should cavalierly construe our constitution more expansively than the United States Supreme Court has construed the Federal Constitution." *State v. Gray,* 413 N.W.2d 107, 111 (citing *Fuller,* 374 N.W.2d at 726–27). It is within this context that we proceed to review Harris' contention that he was illegally seized under Article I, Section 10 of the Minnesota Constitution.

## II.

■ When reviewing pretrial orders on motions to suppress evidence, we may independently review the facts and determine, as a matter of law, whether the district court erred in suppressing—or not suppressing—the evidence. *State v. Othoudt,* 482 N.W.2d 218, 221 (Minn.1992). Specifically, when the facts are not in dispute, a reviewing court must determine whether a police officer's actions constitute a seizure and if the officer articulated an adequate basis for the seizure. *See State v. Storvick,* 428 N.W.2d 55, 58 n. 1 (Minn.1988).

■ Not all encounters between the police and citizens constitute seizures. *In re E.D.J.,* 502 N.W.2d 779, 781 (Minn.1993). Seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *State v. Cripps,* 533 N.W.2d 388, 391 (Minn. 1995) (citing *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n.16, 20 L.Ed.2d 889 (1968)). In other words, officers must not

"convey a message that compliance with their request is required." *Bostick,* 501 U.S. at 435, 111 S.Ct at 2386.

■ Under the Minnesota Constitution, "a person has been seized if in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was neither free to disregard the police questions nor free to terminate the encounter." *Cripps,* 533 N.W.2d at 391 (citing *Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). We have adopted the *Mendenhall–Royer* standard for judging the totality of the circumstances. *E.D.J.,* 502 N.W.2d at 781–82 (citing *Mendenhall,* 446 U.S. at 554–55, 100 S.Ct. 1870; *Royer,* 460 U.S. at 501, 103 S.Ct. 1319). Under that standard, some of the circumstances that might indicate a seizure has taken place include: " 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " *Id.* at 781 (quoting *Mendenhall,* 446 U.S. at 554–55, 100 S.Ct. 1870); *see also Cripps,* 533 N.W.2d at 391 (identifying similar circumstances). " 'In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.' " *E.D.J.,* 502 N.W.2d at 781 (quoting *Mendenhall,* 446 U.S. at 554–55, 100 S.Ct. 1870).[1]

■ A person generally is not seized merely because a police officer approaches him in a public place or in a parked car and begins to ask questions. *See id.* at 782 (cita-

---

1. The dissent asserts that our standard for reviewing whether a seizure takes place is "whether a reasonable person *in the defendant's shoes* would have concluded that he or she was not free to leave." *E.D.J.,* 502 N.W.2d at 780, 783. Viewed in the context of our analysis in *E.D.J.,* however, the "in the defendant's shoes" language would have been more aptly phrased as "in the circumstances." Our reading of the language in *E.D.J.* is supported by our decision in *Cripps,* where we held that Cripps was seized

because, "[u]nder [the] circumstances, * * * an *objectively reasonable person* would have believed that he or she was neither free to disregard the officer's request nor free to terminate the encounter * * *." *Cripps,* 533 N.W.2d at 391 (emphasis added). We cannot accept the dissent's narrowing of the focus of the objectively reasonable person standard. Such a narrowing would render practical application of the standard unworkable.

tion omitted). Moreover, seizure does not result when a person, due to some " 'moral or instinctive pressure to cooperate,' " complies with a request to search because the other person to the encounter is a police officer. *Id.* (quoting Wayne R. LaFave, *"Seizures" Topology: Classifying Detentions of the Person to Resolve Warrant, Grounds and Search Issues*, 17 U. Mich. J.L. Ref. 417, 424–25 (1984) (footnotes omitted)). Further, when a person is seized, courts must suppress evidence gathered as a result of that seizure only when the seizure was unreasonable. *See* Minn. Const. Art. I, § 10; *E.D.J.*, 502 N.W.2d at 783. The brief seizure of a person for investigatory purposes is not unreasonable if an officer has a " 'particular and objective basis for suspecting the particular person [seized] of criminal activity.' " *State v. Johnson*, 444 N.W.2d 824, 825 (Minn.1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). The officer may justify his decision to seize a person based on the totality of the circumstances and "may draw inferences and deductions that might elude an untrained person." *Cripps*, 533 N.W.2d at 391. However, a mere hunch, absent other objectively reasonable articulable facts, will not justify a seizure. *See Johnson*, 444 N.W.2d at 825–26.

*A. Police Officers' Boarding of the Bus*

1. Seizure

 Harris first asserts that he was illegally seized when the police officers boarded the bus and announced their intent to search for drugs. He urges us to adopt, for purposes of the Minnesota Constitution, a per se rule that passengers on a bus are seized as soon as officers board a bus and announce their intent to search for drugs. We decline to adopt the position advocated by Harris.

In urging us to adopt the seizure rule that he advocates, Harris asks us to do so notwithstanding the United States Supreme Court's decision in *Florida v. Bostick*, 501

U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). In *Bostick*, the Supreme Court held that a seizure does not necessarily occur under the Fourth Amendment to the U.S. Constitution merely because an encounter between a citizen and the police takes place on a bus. *Id.* at 439–40, 111 S.Ct. 2382. The facts of *Bostick* are as follows. Uniformed and visibly armed drug interdiction officers boarded a bus, asked to inspect Bostick's ticket and identification, inspected Bostick's ticket and identification, explained their presence as narcotics agents on the lookout for illegal drugs, and gained consent to search his luggage, in which they discovered cocaine. *Id.* at 431–32, 111 S.Ct. 2382. Although one officer held a "recognizable zipper pouch" which contained a gun, the officer never threatened Bostick with the gun. *Id.* at 431–32, 111 S.Ct. 2382. Moreover, Bostick was advised of his right to refuse to comply with the officers' requests. *Id.* at 432, 111 S.Ct. 2382.

The Florida Supreme Court overturned Bostick's conviction, holding that the police practice of boarding buses during scheduled stopovers without reasonable articulable suspicion and questioning passengers per se violates the Fourth Amendment to the U.S. Constitution. *Id.* at 433, 111 S.Ct. 2382. The United States Supreme Court overruled the Florida Supreme Court, stating that an encounter between a citizen and the police does not become coerced on the part of the citizen and, therefore, amount to a seizure, based solely on the fact that the encounter takes place on a bus. *Id.* at 436–37, 111 S.Ct. 2382.

In support of his argument that, under Minnesota's Constitution, he was seized when the police officers boarded the bus and announced their intent to search for drugs, Harris cites *Ascher v. Commissioner of Public Safety*, 519 N.W.2d 183 (Minn.1994). In *Ascher*, we held that random sobriety checkpoints are unconstitutional under the Minnesota Constitution.[2] *Id.* at 184. We stated

2. The United States Supreme Court held, in *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), that sobriety checkpoints, where police use temporary roadblocks to stop cars and investigate a large number of drivers in order to discover

drivers who are alcohol-impaired, are constitutional for purposes of the Fourth Amendment to the United States Constitution. This court, in *Ascher*, concluded that the Minnesota Constitution, in some circumstances, provides greater protection against unreasonable searches and

that, without reasonable articulable suspicion that criminal activity is occurring, even "minimally intrusive" seizures of the "traveling public" are unacceptable. *Id.* at 187. The constitutional deficiency in *Ascher* involved impeding, without reasonable articulable suspicion, the progress of motorists who would not otherwise stop their vehicles so the police could randomly screen for intoxicated drivers. *Id.* at 184. These brief stops were coerced by the police, not voluntary on the part of the motorists, and, therefore, amounted to seizures. The present case presents a fundamentally different situation. Here, there is no indication in the record that the officers impeded the progress of the interstate bus or otherwise used coercion in boarding the bus and questioning passengers during the bus' regularly scheduled stopover in Saint Paul. Because the record fails to show that the officers impeded the progress of the bus or used coercion in boarding the bus and questioning the passengers, *Ascher* does not provide a basis to sustain Harris' argument that he was illegally seized.

Under the circumstances of this case, we find no basis to construe Article I, Section 10 of our constitution, the text of which is identical to the text of the Fourth Amendment, as protecting individual rights to a greater extent than does the U.S. Constitution. Harris bases his argument that he was illegally seized solely on the fact that the officers boarded the bus and announced their intent to search for drugs. We agree with the United States Supreme Court that "[w]here the encounter takes place is one factor, but it is not the only one." *Bostick*, 501 U.S. at 437, 111 S.Ct. 2382. Thus, the mode of transportation, which is normally voluntarily chosen by the passenger, is only one factor in the totality of the circumstances to be considered. While we recognize that circumstances may arise that could lead us to conclude that passengers on a bus are seized when officers board the bus, "[w]e cannot agree * * * that this single factor will be dispositive in every case." *Id.* at 439, 111 S.Ct. 2382. The circumstances presented here, without more, do not mandate a conclusion that Harris was illegally seized when the officers boarded the

seizures than does the federal constitution.

bus and announced their intent to search for drugs. Accordingly, we hold that Harris was not seized at this point in the encounter.

### 2. Reasonable Articulable Suspicion

■ Because we conclude that Harris was not seized when the police officers boarded the bus, it ordinarily would not be necessary to ascertain whether, prior to boarding the bus, the officers had reasonable articulable suspicion that Harris was transporting a controlled substance. We note, however, that the district court found and the court of appeals held that when the officers boarded the bus, they had reasonable articulable suspicion that Harris was transporting a controlled substance. Because we disagree with the conclusions of the lower courts and because analysis of this issue is important to issues raised later in this case, we shall address this issue now.

In his report, Bratsch stated that the officers went to the bus depot to interdict passengers who matched the profile of a drug courier. Subsequently, at the *Rasmussen* hearing, Bratsch testified that no "drug courier profile" exists anymore and that a drug courier "can be anyone." However, Bratsch testified that when conducting a bus-based drug interdiction, he looks for persons who: (1) exit the bus with only a small carry-on bag or with no luggage at all, (2) look around to see if any police or drug dogs are present, (3) enter the depot, (4) appear nervous, (5) perhaps make a phone call, and then (6) either reboard the bus or leave the depot by another means of transportation. Clearly, using Bratsch's criteria, a drug courier can be anyone. *See State v. Williams*, 525 N.W.2d 538, 546–47 (Minn.1994) (stating that an officer may "keep a mental checklist" of factors relevant to determining whether a person might be a drug courier, but that the propriety of the officer's conduct will be examined in the totality of the circumstances).

Both Bratsch and Pyka stated that their suspicion of Harris was based on their conclusion that he was conducting counter surveillance activities in the depot. However, the activities noted by the officers could be

*Ascher,* 519 N.W.2d at 187.

consistent with the activities of any multitude of innocent persons. The officers did not provide any facts sufficient to distinguish Harris from innocent passengers in the depot. *Cf. Johnson*, 444 N.W.2d at 824 (holding that reasonable articulable suspicion was established when a motorist made evasive moves immediately after seeing a trooper's vehicle).

The absence of any activity by Harris inconsistent with legal activity leads us to the conclusion that, when the police officers boarded the bus, they were acting on a mere hunch that Harris was transporting a controlled substance. A hunch, without additional objectively articulable facts, cannot provide the basis for an investigatory stop. *See id.* at 825. Accordingly, we conclude that when the officers boarded the bus, they did not have reasonable articulable suspicion that Harris was transporting a controlled substance.

### B. Encounter with Harris at His Seat

Harris next argues, and the court of appeals held, that Harris was seized when the officers approached him at his seat at the back of the bus. In support of his argument that he was seized when the police officers approached him, Harris cites *State v. Cripps*, 533 N.W.2d 388 (Minn.1995), where we held that the police seized an underage bar patron.

In *Cripps*, two uniformed officers, who were visibly armed and displayed their badges, entered a bar where Cripps sat drinking a beer, approached Cripps at her table, and asked to see her identification. *Id.* at 389–90. The officers did not advise Cripps that she had the right to refuse to comply with the officers' request. Cripps produced false identification that showed she was of legal drinking age. *Id.* at 390. Upon further investigation, the officers determined that the identification Cripps produced was not her own and that she was, in fact, below the legal drinking age. *Id.* We held that, under the facts of that case, Cripps had been seized within the meaning of Article I, Section 10 of the Minnesota Constitution after the officers first asked her to produce identification for the purpose of showing that she was of legal

age to consume alcohol. *Id.* at 391. We concluded that, under these circumstances, "an objectively reasonable person would have believed that he or she was neither free to disregard the officer's request nor free to terminate the encounter, knowing that he or she was being asked to prove his or her innocence of the crime of underage consumption of alcohol." *Id.*

Harris' case can be distinguished from *Cripps*. Cripps was never informed by the armed, uniformed officers who openly displayed their badges that she had the right to refuse to comply with their request to produce identification. Further, she was placed in a position where she was required to prove her innocence. Once approached by the police officers, Cripps had three choices—show her false identification, show her true identification, or refuse to cooperate. But this was really no choice given the circumstances— Cripps was underage and was sitting in a bar with a half-empty bottle of beer in her hand. She was engaged in conduct that, by its very nature, required proof of identification and, specifically, proof that she was of legal drinking age. Put another way, Cripps was engaged in observable conduct that carries with it some legal limitation—that is, if she were not of legal drinking age, her conduct would be illegal. In sum, Cripps had no way out of her situation in the bar.

Unlike the situation in *Cripps*, Harris was twice advised that his compliance with Bratsch's requests to search was not required. Further, the conduct in which Harris was engaged—sitting in his seat on the bus—was not, by its very nature, illegal. Had Harris refused to comply with Bratsch's requests, Bratsch would have been required to terminate the encounter because, at that point, as we noted earlier, Bratsch did not have reasonable articulable suspicion that Harris was transporting a controlled substance. The difference in the nature of the two encounters, coupled with the different factual scenarios, particularly the fact that Harris was twice informed that his compliance with Bratsch's request was not required, leads us to conclude that Harris' reliance on *Cripps* is misplaced.

We further note that the examples of circumstances that might indicate a seizure under the *Mendenhall–Royer* totality of the circumstances standard weigh against concluding that a seizure took place when the officers approached and questioned Harris at his seat on the bus. *See E.D.J.*, 502 N.W.2d at 781–82 (citing *Mendenhall*, 446 U.S. at 554–55, 100 S.Ct. 1870; *Royer*, 460 U.S. at 501, 103 S.Ct. 1319). Based on the record, it does not appear that the officers acted in a "threatening" manner toward Harris. Neither Bratsch nor Pyka displayed a weapon to Harris or to any of the passengers. The officers did not touch Harris in any way when they approached him at his seat. When Bratsch questioned Harris, he used a low key, easy-going tone of voice. Under the totality of the circumstances, these factors do not support Harris' assertion that a seizure occurred when the officers approached and questioned him at his seat. We conclude that Harris was not seized when the officers approached and questioned him at his seat.

Finally, contrary to the dissent's assertion, we do not "ignore the physical surroundings," i.e., the bus setting. Rather, we reach our conclusion by taking into account the bus setting and all the other facts in the record. To reach its conclusion that Harris was seized when the officers approached him at his seat, the dissent characterizes the encounter as one where the police "trapped" Harris at the back of the bus. We do not make such a characterization because we cannot, based on the record we have before us. Harris stipulated to Bratsch's and Pyka's version of the encounter and the officers' version does not include facts by which we can conclude that Harris was trapped. Instead, the officers' version of the encounter is that they did not trap anyone on the bus and that Harris voluntarily cooperated with Bratsch's requests to search. Thus, without a more developed record, we are proscribed from creating our own characterizations of the facts of this encounter, no matter what we may personally believe those facts to be.

Accordingly, we hold that Harris was not seized when the officers approached and questioned him at his seat. Further, in reaching this holding, we expressly hold open the possibility that, given different circumstances, a seizure may take place in a bus setting.

## C. First Search of Harris' Person

After first asking Harris some general identification questions and whether he was transporting any narcotics, weapons, or large amounts of currency, Bratsch asked Harris' permission to conduct a search of Harris' person. Because the police lacked probable cause to search Harris, absent Harris' consent, the search would be illegal. The state claims Harris voluntarily gave consent to be searched, but Harris asserts that the consent he gave was not voluntary. If Harris did not give voluntary consent to the search, then the evidence gathered thereafter must be suppressed. Therefore, we must determine whether Harris' consent was voluntarily given.

■ The police do not need probable cause or, in proper circumstances, reasonable articulable suspicion to search if a person voluntarily consents to an officer's request to search his person and his belongings. *See State v. George*, 557 N.W.2d 575, 579 (Minn. 1997). However, "an officer has a right to ask to search and an individual has the right to say no." *State v. Dezso*, 512 N.W.2d 877, 880 (Minn.1994).

> [I]nvoluntariness of a consent to a police request is not to be inferred simply because the circumstances of the encounter are uncomfortable for the person being questioned. Rather, it is at the point when an encounter becomes coercive, when the right to say no to a search is compromised by a show of official authority, that the Fourth Amendment intervenes. Consent must be received, not extracted.

*Id.; see also Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Whether consent was voluntary is determined by examining "the totality of the circumstances, including the nature of the encounter, the kind of person the defendant is, and what was said and how it was said." *Dezso*, 512 N.W.2d at 880. The state bears the burden of showing by a preponderance of the evidence that consent was voluntarily obtained. *See Cripps*, 533 N.W.2d at 392.

The determination involves balancing the government's legitimate need to search against the requirement that consent not be coerced. *Schneckloth,* 412 U.S. at 219, 93 S.Ct. 2041.

In support of his argument that he did not voluntarily consent to Bratsch's request to search, Harris first cites *State v. Dezso,* 512 N.W.2d 877 (Minn.1994). In *Dezso,* we held that the state did not meet its burden of showing that a police officer obtained voluntary consent when the officer searched a defendant's wallet during a traffic stop on a highway at night. *Id.* at 881. While the officer used a conversational tone in his questioning, he leaned over to look into defendant's wallet, did not inform the defendant that he had the right to refuse to consent, and persistently questioned the defendant about the contents of the wallet. *Id.* In further support of his argument, Harris cites *State v. George,* 557 N.W.2d 575 (Minn.1997). In *George,* we held that the state produced insufficient evidence to show that the defendant voluntarily consented to a search of his motorcycle when the defendant was stopped for a minor traffic violation. *Id.* at 581. The defendant in *George* was subjected to persistent questioning by two state troopers, was unaware that he had a right to refuse to consent, and answered the troopers' questions with equivocal responses. *Id.*

In the present case, Harris was a passenger on an interstate bus that was making a regularly scheduled stopover in Saint Paul. The stopover occurred at approximately 10:30 in the morning. Bratsch and Pyka, both in plainclothes and neither visibly armed, boarded the bus, stood near where Harris was sitting, announced their intention to question all the passengers, stated that any questioning or searching would be voluntary, and approached Harris, who was seated at the back of the bus. Bratsch then advised Harris individually that "this was all consensual" and asked Harris one time whether he was carrying any weapons, narcotics, or large amounts of currency. Harris replied that he was not. Bratsch asked Harris, in a low key, easy-going tone of voice, for permission to search his person. Bratsch testified that Harris probably said, "yes, go ahead." Har-

ris then stood up and Bratsch searched him. Again, we note that Harris stipulated to Bratsch's version of what transpired at the time Bratsch conducted this first search of his person.

The circumstances presented in Harris' case are much different than the circumstances presented in either *Dezso* or *George.* In *Dezso,* the request for consent to search took place at night and the officer leaned over to look into Dezso's wallet while he repeatedly asked Dezso's permission to search the wallet. Here, it was mid-morning when Bratsch requested Harris' consent to search. There is no evidence that Bratsch hovered over Harris or leaned over when he asked for Harris' consent to search. In *George,* troopers persistently questioned the defendant in order to gain his consent and the defendant responded equivocally to the troopers' requests for consent to search. Here, the record reveals that Harris promptly responded to Bratsch's request to search and did so unequivocally. In both *Dezso* and *George,* the defendants were not advised of their right to refuse to comply with the officers' requests that they consent to the searches. Harris stipulated that he was informed on two separate occasions that his cooperation was voluntary, once when the officers boarded the bus and once when they approached him individually. Based on these facts, we conclude that Harris voluntarily consented to the first search of his person.

### D. Search of Harris' Bag

When the first search of Harris' person produced no drugs, weapons, or large amounts of currency, Bratsch asked Harris if he had a bag. According to the police reports and testimony, Harris told the officers he had a bag in one of the overhead compartments. Both officers stated that Harris gave Bratsch permission to search the bag. As with the first search of Harris' person, there is nothing in the facts to support the position that the consent Harris gave to the search of his bag was anything other than voluntary.

Bratsch searched Harris' bag and found miscellaneous clothing and papers. He also found two baggies, each containing 40–75 plastic bindles. Once Bratsch found

the bindles in Harris' bag, Harris' situation fundamentally changed. When Bratsch pointedly confronted Harris, telling Harris that he knew that bindles are used to package drugs for sale and asking where the drugs were, Harris became fully aware that the officers knew that he might be transporting a controlled substance. Harris could not have, and a reasonable person would not have, felt free to terminate the encounter under these circumstances. Thus, it was at this point that Harris was seized.

### E. Second Search of Harris' Person

#### 1. Consent

■ Harris contends that he did not voluntarily consent to the second search of his person, a search conducted after he was seized, and that, therefore, the evidence obtained as the result of this second search should have been suppressed. Consent is not involuntary merely because the person giving the consent has been seized. *See State v. Alayon*, 459 N.W.2d 325, 330 (Minn. 1990) (holding that a defendant gave voluntary consent when, sometime after being ordered at gunpoint to lie on the floor, he was allowed to stand up, the police put away their guns, and the defendant then gave the police consent to search and assisted in the search). Rather, we look to the totality of the circumstances to determine whether consent was voluntarily given. *See id.* at 330. Here, the circumstances that led us to conclude that Harris was seized—Bratsch finding the plastic bindles in Harris' bag, then pointedly telling Harris that he knew what bindles were used for and that Harris should give Bratsch the drugs—also lead us to conclude that the consent Harris gave to the search of his jacket sleeve was not voluntary. Accordingly, we hold that Harris did not voluntarily consent to the second search of his person.

#### 2. Reasonable Articulable Suspicion

■ Generally, evidence gathered pursuant to consent that is determined to be involuntary must be suppressed. *See, e.g., Dezso*, 512 N.W.2d at 881. Because Harris did not voluntarily consent to the second search of his person, in order to justify Bratsch's second search of Harris' person, Bratsch must

have had another basis to justify the search. Therefore, we turn our attention to whether at this point Bratsch had reasonable articulable suspicion that Harris was "armed and dangerous."

■ When an officer has reasonable articulable suspicion that a person he has seized is armed and dangerous, the officer may conduct a protective pat-down search of the person's outer clothing in order to ascertain whether the person is armed. *Terry*, 392 U.S. at 30, 88 S.Ct. 1868; *see also State v. Ludtke*, 306 N.W.2d 111, 113 (Minn.1981). If, during the course of this protective pat-down search, an officer locates what he immediately and without further manipulation has probable cause to believe is evidence of a crime, then the officer may legally seize that evidence. *See Minnesota v. Dickerson*, 508 U.S. 366, 375–76, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *Ludtke*, 306 N.W.2d at 113.

■ After Bratsch found the plastic bindles in Harris' bag, he noted that Harris appeared extremely nervous and tried to hide his left arm. Bratsch testified that, at that point, he did not know whether Harris had a gun. When he ordered Harris to place his left arm on his lap, Bratsch noticed a large bulge in the sleeve of Harris' jacket. Then, when Bratsch questioned Harris as to what was in the jacket sleeve, Harris responded that he did not know. Under these circumstances, Bratsch's conclusion that Harris might be armed and dangerous was reasonable. Thus, at that point, Bratsch had reasonable articulable suspicion that Harris might be armed and dangerous, and a protective pat-down search of Harris' outer clothing was justified.

■ But Bratsch did not pat down Harris' outer clothing. Instead, he asked Harris for permission to search Harris' jacket sleeve and, pursuant to Harris' apparent consent, reached his hand into the jacket sleeve "through the arm" and pulled out a "large baggy" of marijuana. By searching Harris' jacket sleeve from inside the jacket, Bratsch exceeded the scope of a proper protective pat-down search. *See Terry*, 392 U.S. at 30, 88 S.Ct. 1868. Normally, when police exceed the scope of a protective pat-down search,

thereby performing an illegal warrantless search, any evidence gathered as a result of that search should be suppressed. *See State v. Dickerson*, 481 N.W.2d 840, 843 (Minn. 1992); *aff'd* 508 U.S. at 378–79, 113 S.Ct. 2130. We recognize an exception to this general rule, however, when "the police would have obtained the evidence if no misconduct had taken place." *See In re J.W.K.*, 583 N.W.2d 752 (Minn.1998) (citing *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). This exception is commonly known as the "inevitable discovery" exception. *See id.* at 756. In the present case, the totality of the circumstances indicates that, had Bratsch performed a protective outer-clothing pat-down search of Harris' jacket, he would have felt, then seized, what he had probable cause to believe was marijuana, which would have been admissible against Harris. *See Ludtke*, 306 N.W.2d at 113. *See also Dickerson*, 481 N.W.2d at 846. Bratsch, an experienced drug interdiction officer, had already found plastic bindles, commonly used in the packaging and sale of controlled substances. Immediately after Bratsch found the bindles, Harris began to act nervously and tried to hide his arm from Bratsch's view. Then, when Bratsch next saw Harris' arm, there was a noticeable bulge in the sleeve of Harris' jacket.

 Had Bratsch then proceeded to search Harris' jacket via a permissible pat-down search, he would have felt a plastic bag containing a suspicious substance. Even if Bratsch may not have been able to positively identify the substance in the plastic bag as marijuana by his sense of touch alone, under the totality of the circumstances surrounding such a discovery, the presence of a plastic bag containing a substance consistent with marijuana hidden on Harris likely would have given Bratsch probable cause to believe that the bag contained a controlled substance. *See Dickerson*, 481 N.W.2d at 846; *Ludtke*, 306 N.W.2d at 113. With probable

cause, Bratsch could have permissibly seized the plastic bag. *See Dickerson*, 481 N.W.2d at 843. The only reason that Bratsch patted down Harris' jacket sleeve from the inside of the jacket as opposed to the outside of the jacket was that he believed he had obtained Harris' voluntary consent to search the jacket sleeve from the inside. Therefore, we conclude that it was inevitable that Bratsch would have discovered and legally seized the marijuana during a protective pat-down search.

Because legal discovery of the marijuana was inevitable, the intervening illegality of performing a search of Harris' jacket sleeve from the inside of his jacket sleeve pursuant to Harris' apparent, but involuntary, consent cannot operate to invalidate the search. Accordingly, we hold that the second search of Harris' person and the resulting seizure of the marijuana found in Harris' jacket was justified and that the marijuana should not have been suppressed.

Affirmed.

LANCASTER, J., took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

I respectfully dissent. The court's conclusion that Harris was not seized until the police officers found the plastic bindles in Harris' bag is not supported by our prior decisions. We have said that "a person has been seized if in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was neither free to disregard the police questions nor free to terminate the encounter." [1] While the "reasonable person standard is an objective standard which * * * does not vary with a particular person's subjective state of mind," [2] we have made it clear that we must determine "whether a reasonable person in the defendant's shoes would have concluded that he or she was not free to leave." [3]

1. *State v. Cripps*, 533 N.W.2d 388, 391 (Minn. 1995) (citing *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

2. *Cripps*, 533 N.W.2d at 391.

3. *In re E.D.J.*, 502 N.W.2d 779, 780 (Minn.1993). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (stating that age and educational background are legitimate factors to consider in determining whether a person's consent was voluntary).

The court's analysis does not take into account whether an innocent young African–American male would feel free to refuse the police officer's request to search his person, his luggage, or to leave the bus. The record in this case reveals that the police officers walked to the rear of the bus, stood in the middle of the aisle, and told the passengers that their purpose for boarding the bus was to look for narcotics, weapons, or large amounts of cash. Immediately after making these statements, the police officers approached Harris and asked him if he was transporting any narcotics, weapons, or large amounts of cash. The question that arises out of this encounter is whether an innocent young African–American male in Harris' position would feel free to refuse to answer the police officer's questions. In my experience it is not so clear that he would.[4] Two police officers were standing in the middle of the

bus aisle, blocking the only exit,[5] with the intent to ask Harris whether he was transporting any weapons, narcotics, or large amounts of cash.[6] The reality of the world is such that a person in Harris' position would likely feel compelled to comply with the police officers' requests.[7] One need only recall the encounter between the police and Don Jackson, an African–American male and former police officer from southern California, who was pushed through a plate glass window by a police officer when he dared to inquire why he had been stopped.[8] Mr. Jackson has written that "the police have long been the greatest nemesis of blacks, irrespective of whether we are complying with the law or not."[9] Mr. Jackson's experience is but one of many publicized accounts of that type of encounter between African–Americans and the police.[10]

**4.** I speak from the perspective of an African–American male who was taught by his parents that, for personal safety, when in an unplanned encounter with law enforcement officers, it is best to comply carefully and without question to the officers' request. It is a lesson that I have taught my children and, in fact, is one that I follow to this day.

**5.** The court appears to ignore the physical surroundings during the police officers' encounter with Harris. The police officers did not merely approach Harris in the bus depot; they trapped him in the back of a bus with no reasonable means of egress. Although the United States Supreme Court has held that a seizure does not occur *per se* for purposes of the Fourth Amendment merely because the encounter between a citizen and the police takes place on a bus, the Court has not foreclosed consideration of the restrictive nature of a bus in determining whether a reasonable person would feel seized. *See Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

**6.** *See E.D.J.*, 502 N.W.2d at 781 (listing circumstances that might indicate that a seizure had taken place).

**7.** The police officer's statements that "this is all consensual" should not alter this result. The statement was confusing at best and misleading at worst. In fact, a reasonable person in Harris' position might well view such a statement as a command requiring him to comply with the police officer's requests. *See Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041.

**8.** *See* Tracey Maclin, *"Black and Blue Encounters"—Some Preliminary Thoughts about Fourth*

*Amendment Seizures: Should Race Matter?*, 26 Val. U.L.Rev. 243, 254 (1991) [hereinafter *Should Race Matter?*].

**9.** *See id.* (citing Don Jackson, *Police Embody Racism To My People*, N.Y. Times, January 23, 1989, at A25).

**10.** In the book *Race, Crime, and the Law*, Harvard Law School Professor Randall Kennedy notes the problem by referencing a United States District Court judge who

carefully detailed numerous incidents which provide a virtual catalogue of the types of police mistreatment that have become deeply etched in the popular folklore of African–Americans: flagrant use by officers of the racial epithet "nigger"; resort to deadly force against suspects who could have been subdued by other means; harsher reactions to blacks than to whites engaged in the same conduct; needlessly destructive searches; unwarranted detentions; arrests for nothing more than what police perceived as insufficient deference; and purposeful infliction of public humiliation on political activists seeking to elevate the status of black Americans.

Randall Kennedy, *Race, Crime, and the Law* 122 (1997) (citing *Council of Organization on Philadelphia Police Accountability and Responsibility v. Rizzo*, 357 F.Supp. 1289 (E.D.Pa.1973)). While the *Rizzo* decision comes out of Philadelphia in 1973, it could just as well be documenting events from any city across the country today. *See also Should Race Matter?*, 26 Val. U.L.Rev. at 278 (stating that "it comes as no surprise that some black men go out of their way to be calm and extremely congenial when approached by a police officer. A black man's

Once the police officers approached Harris for the express purpose of investigating him for specific criminal violations, I believe Harris was seized for the purposes of Article I, Section 10 of the Minnesota Constitution.[11] The court concedes that the police officers did not have a probable cause [12] to search either Harris' person or his bag before they boarded the bus and the record does not reveal any facts that would have given the officers a reason to target Harris, except for the results of their illegal search, once they boarded the bus. Therefore, the plastic bindles and the marijuana should have been suppressed.[13]

silence in the face of police demands should not be interpreted as cooperation, however"); Andrew Hacker, *Two Nations: Black and White, Separate, Hostile, Unequal* 51 (1992) (describing typical encounters between the police and young African–American males).

11. *See Cripps,* 533 N.W.2d at 391 (citing *State v. Kearns,* 75 Haw. 558, 867 P.2d 903, 907–08 (1994)) (holding that a reasonable person would believe that he or she has been seized when an officer approaches that person for the express purpose of investigating him or her for specific criminal violations and begins to ask for information).

12. *See Cripps,* 533 N.W.2d at 391 (citing *Berge v. Comm'r of Pub. Safety,* 374 N.W.2d 730, 732 (Minn.1985)) (stating that an officer must have "a particularized and objective basis for suspecting the seized person of criminal activity").

