*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0614**

State of Minnesota,
Respondent,

vs.

Tony Luke Fisher,
Appellant.

**Filed March 28, 2016
Affirmed
Johnson, Judge**

Isanti County District Court
File No. 30-CR-13-625

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Jeffrey R. Edblad, Isanti County Attorney, Cambridge, Minnesota; and

Scott A. Hersey, Special Assistant County Attorney, Minnesota County Attorney's
Association, St. Paul, Minnesota (for respondent)

Mark D. Kelly, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Johnson, Judge; and Reyes,
Judge.

**U N P U B L I S H E D   O P I N I O N**

**JOHNSON**, Judge

Tony Luke Fisher was convicted of third-degree controlled substance crime based
on evidence that he possessed methamphetamine. He argues that the district court erred

by denying his motion to suppress evidence that was obtained after a law-enforcement officer seized him on his property. We affirm.

## FACTS

On September 24, 2013, at approximately 1:15 a.m., Deputy Chad Meyer of the Isanti County Sheriff's Department was on patrol when he drove past a scrapyard owned by Fisher's family, which is near Fisher's residence. Deputy Meyer observed an occupied car with its engine running in the scrapyard and became concerned about a possible theft. Deputy Meyer drove into the scrapyard through a driveway that he described as a "field approach" and shined his spotlight on the car, which was directly in front of him. After seeing the car and its occupant, Deputy Meyer believed that Fisher likely was the person in the car.

Deputy Meyer parked his squad car and approached the car on foot. As he did so, he became certain that Fisher was the person in the car. Deputy Meyer continued to approach the car to "make sure [Fisher] didn't need help" and to "make sure that [Fisher] wasn't chasing people off of his property." Deputy Meyer spoke to Fisher through the passenger-side window for approximately one minute. He asked Fisher "what was going on." Fisher responded by stating that he had heard a noise and also by asking Deputy Meyer, "What are you doing driving here?" Fisher's answer indicated to Deputy Meyer that other persons may have been present in the scrapyard, which renewed his concern about a possible theft and also gave rise to a concern for his safety. While talking to Fisher, Deputy Meyer shined his flashlight around the outside of Fisher's car to make sure no one else was present and inside the car to check for weapons. As he shined his flashlight into

2

the vehicle, he saw a glass pipe in the center console, which he suspected was a methamphetamine pipe.

Deputy Meyer ordered Fisher to place his hands on the steering wheel, and he walked around to the driver's side of the car. Fisher locked the driver's door before Deputy Meyer could open it. Deputy Meyer told Fisher that he had seen the glass pipe and ordered him to get out of the car. Fisher said, "I don't care," put the car in gear, and drove off. Deputy Meyer returned to his squad car, activated his emergency lights, and pursued Fisher's car through tall grass, shrubs, and small trees until Fisher crashed his car into a flatbed truck. Deputy Meyer exited his squad car and approached the driver side of Fisher's car with his handgun drawn and ordered Fisher to keep his hands up. Fisher exited his car from the passenger side and fled on foot through woods. Deputy Meyer pursued him and brought him to the ground after approximately 50 yards. When Deputy Meyer handcuffed Fisher and turned him over, he found a plastic baggie, which contained a substance that Deputy Meyer suspected was methamphetamine. A field test determined that the baggie contained 7.1 grams of methamphetamine. Another officer brought Fisher to the Isanti County Jail, where he was read the implied-consent advisory. Fisher refused to submit to either a blood test or a urine test.

The state charged Fisher with four offenses: (1) second-degree controlled substance crime, in violation of Minn. Stat. § 152.022, subd. 2(a)(1) (2012); (2) fleeing a peace officer in a motor vehicle, in violation of Minn. Stat. § 609.487, subd. 3 (2012); (3) gross-misdemeanor test refusal, in violation of Minn. Stat. § 169A.20, subd. 2 (2012); and (4) driving while impaired, in violation of Minn. Stat. § 169A.20, subd. 1(2) (2012). The

3

state later amended count 1 to allege third-degree controlled substance crime, in violation of Minn. Stat. § 152.023, subd. 2(a)(1) (2012).

In October 2013, Fisher moved to suppress all evidence obtained after Deputy Meyer approached him in the scrapyard. Fisher argued that the incriminating evidence was obtained because Deputy Meyer seized him without a reasonable, articulable suspicion of criminal activity. In April 2014, the district court conducted an evidentiary hearing on Fisher's motion. Deputy Meyer testified for the state. Fisher did not present any evidence. In July 2014, the district court issued an order denying Fisher's motion. The district court determined that Deputy Meyer did not seize Fisher, for purposes of the Fourth Amendment, before Deputy Meyer saw the glass pipe in plain view inside Fisher's car. The district court also determined, in the alternative, that even if Deputy Meyer seized Fisher in violation of the Fourth Amendment, the evidence should not be excluded because Fisher's subsequent conduct would purge the taint of an unconstitutional seizure.

In November 2014, the parties agreed to a stipulated-evidence court trial. *See* Minn. R. Crim. P. 26.01, subd. 4. The district court found Fisher guilty of third-degree controlled substance crime and dismissed the other counts. In January 2015, the district court sentenced Fisher to 30 months of imprisonment. Fisher appeals.

## D E C I S I O N

Fisher argues that the district court erred by denying his motion to suppress evidence. Specifically, he argues that evidence was obtained in violation of his constitutional rights because Deputy Meyer seized him without a reasonable, articulable suspicion of criminal activity.

4

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A substantially similar provision is contained in the Minnesota Constitution. *See* Minn. Const. art. I, § 10. In this case, Fisher asserts his rights under both the federal and the state constitutions.

As a general rule, a law enforcement officer may not stop and search a person in a motor vehicle without probable cause. *State v. Flowers*, 734 N.W.2d 239, 248 (Minn. 2007). But a law enforcement officer may conduct a brief investigatory detention of a person in a motor vehicle if the officer has a reasonable, articulable suspicion that the person might be engaged in criminal activity. *State v. Diede*, 795 N.W.2d 836, 842 (Minn. 2011) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)). A reasonable, articulable suspicion exists if "the police officer [is] able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880. Reasonable suspicion requires "something more than an unarticulated hunch"; "the officer must be able to point to something that objectively supports the suspicion at issue." *State v. Davis*, 732 N.W.2d 173, 182 (Minn. 2007) (quotation omitted); *see also Terry*, 392 U.S. at 21-22, 88 S. Ct. at 1880.

To resolve Fisher's argument, we must determine when Deputy Meyer seized him. Specifically, we must determine whether Deputy Meyer seized Fisher before Deputy Meyer saw the glass pipe in plain view. "Not all encounters between the police and citizens constitute seizures." *State v. Harris*, 590 N.W.2d 90, 98 (Minn. 1999). An officer does

not necessarily effect a seizure merely by approaching a person who is standing in a public place and asking the person a few questions. *In re Welfare of E.D.J.*, 502 N.W.2d 779, 782 (Minn. 1993); *State v. Houston*, 654 N.W.2d 727, 731-32 (Minn. App. 2003), *review denied* (Minn. Mar. 20, 2003). Similarly, an officer does not necessarily effect a seizure merely by approaching and speaking with a person who is inside a parked vehicle. *State v. Vohnoutka*, 292 N.W.2d 756, 757 (Minn. 1980); *State v. Klamar*, 823 N.W.2d 687, 692 (Minn. App. 2012). Rather, under Minnesota law, a person is seized only if, given the totality of the circumstances, a reasonable person in that situation would not feel free to terminate the encounter. *Harris*, 590 N.W.2d at 98; *Houston*, 654 N.W.2d at 732. Circumstances that might indicate a seizure include the threatening presence of several officers, an officer's display of a weapon, an officer's physical touching of the person, or the officer's use of language or tone of voice indicating that compliance might be compelled. *E.D.J.*, 502 N.W.2d at 781 (citing *United States v. Mendenhall*, 446 U.S. 544, 554-55, 100 S. Ct. 1870, 1877 (1980)). In the absence of some affirmative display of authority, "otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.* (quoting *Mendenhall*, 446 U.S. at 554-55, 100 S. Ct. at 1877).[1] This court applies a *de novo* standard of review

---

[1]The United States Supreme Court may have modified the *Mendenhall* test in *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547 (1991), in which it held that a seizure occurs "only when police use physical force to restrain a person or, absent that, when a person physically submits to a show of authority by the police." *E.D.J.*, 502 N.W.2d at 780; *see also Hodari D.*, 499 U.S. at 626-29, 111 S. Ct. at 1550-52. The Minnesota Supreme Court has held that *Hodari D.* does not apply to article I, section 10, of the Minnesota Constitution. *E.D.J.*, 502 N.W.2d at 781-83. Fisher has invoked both his

6

to the questions of whether and when a seizure occurred, if the underlying facts are undisputed. *Harris*, 590 N.W.2d at 98. This court applies a clear-error standard of review to a district court's findings of fact concerning an alleged seizure. *Diede*, 795 N.W.2d at 843.

In this case, Fisher makes two contentions concerning when he was seized. He initially contends that he was seized when "Deputy [Meyer] positioned his vehicle off the public road, onto [Fisher's] property in such a manner as to block an exit [Fisher] had from his property to the roadway." He also contends that he was seized when "Deputy Meyer (1) pulled his marked squad car off the public roadway onto the secluded private land owned by [Fisher] at [night], (2) shined [Fisher's] operating vehicle with a spotlight, (3) and then questioned [Fisher] at length about his reason for being present in the vehicle."

Fisher's first contention is inconsistent with the evidentiary record. Fisher is correct that a seizure may occur if a police officer prevents a parked vehicle from driving away by blocking the vehicle's exit with the officer's squad car. *See State v. Sanger*, 420 N.W.2d 241, 243-44 (Minn. App. 1988). But a seizure does not occur if the officer's squad car does not prevent the parked vehicle from driving away. *Illi v. Commissioner of Pub. Safety*, 873 N.W.2d 149, 152 (Minn. App. 2015). The record shows that Deputy Meyer parked his squad car to the side of and perpendicular to Fisher's car. In that position, Deputy Meyer's squad car did not prevent Fisher from driving away. In fact, Fisher did drive away from Deputy Meyer, after Deputy Meyer saw the glass pipe and ordered Fisher to get out

federal and his state constitutional rights. To the extent that we look to federal caselaw to guide our analysis of state constitutional law, we look only to the pre-*Hodari D.* caselaw.

of his car. Furthermore, Deputy Meyer's squad car was obstructing only one of multiple driveways to Fisher's property such that Fisher could have departed from his property via another driveway. Thus, before Deputy Meyer saw the glass pipe, Deputy Meyer did not prevent Fisher from driving away from the place where his car was parked.

Fisher's second contention is inconsistent with the relevant caselaw. As stated above, a law-enforcement officer does not necessarily seize a person inside a parked vehicle simply by approaching the vehicle and speaking with the person. *Vohnoutka*, 292 N.W.2d at 757; *Klamar*, 823 N.W.2d at 692. A law-enforcement officer may speak with a person inside a parked vehicle for purposes of a "welfare check," *i.e.*, to ensure that the person is not in distress or in need of assistance. *Klamar*, 823 N.W.2d at 692-93. In addition, a law-enforcement officer also may speak briefly with a person inside a parked or stopped vehicle even if the reasons that caused the officer to investigate have dissipated, if the officer believes that it is appropriate to explain his or her actions to the person inside the vehicle. *State v. Lopez*, 631 N.W.2d 810, 813-14 (Minn. App. 2001), *review denied* (Minn. Sept. 25, 2001). Furthermore, a law-enforcement officer does not necessarily seize a person inside a parked vehicle by shining a squad car's spotlight on the exterior of the stopped vehicle, *Illi*, 873 N.W.2d at 152-53, or by shining a flashlight into the interior of the vehicle if the officer is lawfully in that particular vantage point, *State v. Alesso*, 328 N.W.2d 685, 687 (Minn. 1982); *Vohnoutka*, 292 N.W.2d at 757; *State v. Krech*, 381 N.W.2d 898, 899 (Minn. App. 1986). Thus, Fisher is incorrect in arguing that Deputy Meyer seized him simply because the officer stopped his squad car near Fisher's car, shined his flashlight into Fisher's car, and asked him some questions. We reject Fisher's

characterization of the verbal exchange as one in which Deputy Meyer "questioned [him] *at length* about his reason for being present in the vehicle." (Emphasis added.) We have reviewed the video-recording created by Deputy Meyer's dashboard camera, and we note that the initial conversation between Deputy Meyer and Fisher lasted approximately one minute.

To reiterate, whether Fisher was seized before Deputy Meyer saw the glass pipe in plain view inside Fisher's car depends on whether, given the totality of the circumstances, a reasonable person in Fisher's position would have felt that he was not free to terminate the encounter. *See Houston*, 654 N.W.2d at 732. The relevant circumstances include whether there was a threatening presence of multiple officers, whether an officer displayed a weapon, whether an officer physically touched the person, or whether the officer used language or a tone of voice that indicated that compliance was compelled. *E.D.J.*, 502 N.W.2d at 781. The evidentiary record does not indicate that any of these circumstances were present. Deputy Meyer was alone; there was not a threatening presence of multiple officers. Deputy Meyer did not display a weapon before he saw the glass pipe. Deputy Meyer did not touch Fisher before he saw the glass pipe. In fact, Deputy Meyer spoke to Fisher from the passenger's side of Fisher's car. Deputy Meyer did not use language or a tone of voice that would indicate to Fisher that he was seized. Rather, Deputy Meyer used a relatively calm tone of voice when asking Fisher a few questions about why he was sitting in his car in his scrapyard late at night and whether any other person was present. *See Lopez*, 631 N.W.2d at 813-14. Thus, the evidentiary record does not support Fisher's

9

contention that Deputy Meyer seized him before the officer saw the glass pipe in plain view inside Fisher's car.

Fisher contends further that the analysis concerning whether and when he was seized must account for the fact that the encounter with Deputy Meyer occurred on his own property, not in a public place. Fisher does not specifically or categorically challenge Deputy Meyer's warrantless entry onto his property. Rather, Fisher contends that the location of the encounter should affect the constitutional seizure analysis by a matter of degree. Fisher concedes that he has no caselaw to support this contention. Indeed, it appears that the cases concerning whether a person has been seized arise from encounters occurring in public places. We are unaware of any authority that would alter the seizure analysis in the way Fisher urges. We believe that the multi-factor test is capable of accounting for the location of an encounter between an officer and a person who owns or occupies private property. *See E.D.J.*, 502 N.W.2d at 781.

In sum, given the district court's findings of fact, the district court properly concluded that Deputy Meyer did not seize Fisher before seeing the glass pipe in plain view inside Fisher's car. Therefore, the district court did not err by denying Fisher's motion to suppress evidence. In light of that conclusion, we need not consider Fisher's challenge to the district court's alternative basis for denying the motion and need not consider the state's alternative argument based on the open-fields doctrine.

**Affirmed.**

10